**A. G. BECKER INCORPORATED, Plaintiff,**

v.

**The BOARD OF GOVERNORS OF the FEDERAL RESERVE SYSTEM et al., Defendants.**

**Civ. A. No. 80–2175.**

United States District Court, District of Columbia.

Nov. 26, 1980.

James H. Schropp, Virginia Crisman, Fried, Frank, Harris, Shriver & Kampleman, Washington, D. C., for plaintiff.

William H. Briggs, Jr., Washington, D. C., for defendants.

## MEMORANDUM OPINION

JOYCE HENS GREEN, District Judge.

Pending before the Court is the plaintiff's motion for a preliminary and final injunction seeking various forms of relief in order to remedy alleged violations by the defendants of the Government in the Sunshine Act, 5 U.S.C. § 552b (1976) ("Sunshine Act"). The defendants have moved to dismiss the plaintiff's complaint, or, in the alternative, for summary judgment. After plaintiff's motion for a temporary restraining order was denied on August 27, 1980, the parties agreed, with the approval of the Court, to consolidate this proceeding with an action on the merits of this dispute.

Plaintiff, A. G. Becker, Inc., ("Becker") a Delaware corporation with its principal headquarters in Chicago, Illinois, is a broker and dealer in securities and is registered with the United States Securities and Exchange Commission. Named defendants include the Board of Governors of the Federal Reserve System, its Chairman, Paul A. Volcker, and the other six individuals who serve on the Board, referred herein collectively as "the Board" or the defendants. Defendants are primarily responsible for regulating the nation's banking system and for making policy determinations concerning the governmental effort to monitor and manage the American economy. Becker claims that the defendants violated the Sunshine Act when the Board met on two separate occasions in the summer of 1980 to consider a matter raised by the plaintiff and another interested party, the Securities Industry Association ("SIA"), concerning the alleged illegal sale of commercial paper by a state member bank in the Federal Reserve System, Bankers Trust Company of New York, New York,[1] (Bankers Trust).

This controversy began in mid–1978, when Bankers Trust initiated a new service to corporations and investors by placing with interested investors several commercial paper issues. In November, 1978, the Board's General Counsel discussed with representatives of Becker and SIA the factual, legal, and policy implications of Bankers Trust's activities. The General Counsel suggested that both parties submit material on the matter, and Becker responded on November 29, 1978, with a detailed petition to the Board outlining its concerns about the actions of Bankers Trust and requesting the Board to make factual findings concerning the sale of commercial paper by state member banks of the Federal Reserve System. On January 31, 1979, Becker submitted a detailed memorandum concerning Bankers Trust's sale of commercial paper and discussing the implications of Bankers

Trust's pursuits in the commercial paper field. The petition also requested the Board "to advise Bankers Trust that its current commercial paper marketing activities are inappropriate as a matter of law and policy, and should cease." (Mem. of Pl. to the staff of the Bd. of Govs., Nov. 29, 1978 at 3). During this time, the Board also requested from Bankers Trust various submissions dealing with its sale of commercial paper, and additionally, the SIA submitted materials as a representative of the securities industry.

On June 28, 1979, the Board's General Counsel concluded that Bankers Trust, and state member banks generally, may sell commercial paper as an agent for the issuer, subject to certain limitations. In letters to Becker and the SIA on June 29, the General Counsel invited both parties to request that he bring the matter to the attention of the Board of Governors. On July 26, 1979, SIA submitted to the Board a formal petition asking review of the entire matter and that the Board order Bankers Trust to cease and desist from all commercial paper activities on behalf of third parties. Becker indicated by letter of August 22, 1979, that it intended to submit a petition to the Board challenging Bankers Trust's activities pending the resolution of its request pursuant to the Freedom of Information Act ("FOIA") for materials in the Board's possession concerning the sale by member banks of commercial paper. The Board granted in part the plaintiff's FOIA request, and on September 7, 1979, plaintiff appealed that part of the Board's decision denying access to certain materials. Subsequently, the Board partially granted and partially denied the appeal; Becker did not seek judicial review of the Board's action.

The General Counsel advised the plaintiff on November 6 that he was prepared to present the SIA petition to the Board and inquired as to when plaintiff would submit

---

1. The Board issued its final rule on September 26, 1980, permitting Bankers Trust to sell commercial paper under applicable federal statutory and administrative provisions. The decision is the subject of additional litigation. See *A. G.* *Becker, Inc. v. Board of Governors of the Federal Reserve System*, No. 80–2258 (D.C.Cir., filed Oct. 14, 1980); *A. G. Becker, Inc. v. Board of Governors of the Federal Reserve System*, No. 80–2614 (D.D.C., filed Oct. 14, 1980).

its petition. One month later, on December 6, plaintiff informed the General Counsel that it did not intend at that time to present additional materials to the Board, but reserved the right to do so in the future. Finally, on January 31, 1980, Becker indicated to the General Counsel that it desired that the documents it originally submitted in November 1978 and January 1979 be considered with the SIA petition. The Board's staff then began to investigate the matter preparatory to the Board's consideration of the question.

The Board intended to address the question presented by the SIA and the Becker petitions on July 14, 1980, but did not reach the matter in that meeting. (Defendant's Reply Memorandum, exhibit E). On July 16, it met to consider the petitions. At the beginning of the meeting, the Board voted to close the meeting to the public pursuant to three exemptions of the Sunshine Act, exemption four for commercial and financial information, 5 U.S.C. § 552b(c)(4),[2] exemption eight for reports prepared for the use of an agency responsible for regulating financial institutions, *id.* at § 552b(c)(8),[3] and exemption ten, for meetings which concern an agency's initiation or participation in adjudicatory proceedings, *id.* at § 552b(c)(10).[4] After taking and recording the vote, the Board released at 3:00 p. m. on the same day the record of the vote and a notice of the meeting in the public reading room of the Federal Reserve System.

On August 21, 1980, the plaintiff's counsel protested the closing of the July 16 meeting, and sought opportunity for oral argument at the next meeting in which the

Board would consider the Becker and SIA petitions. The next morning, August 22, a member of the Board's staff telephoned Becker's counsel to advise him that the Board would consider his request for an open meeting and that the Board intended that day to take up the matter presented by the Becker and SIA petitions. (Aff. of James H. Schropp in Pl. Motion for Temp. Rest. Order, ¶ 3). The Board met on August 22, voted to close the meeting, and followed the same procedures regarding recordation of the vote and notice of the meeting as occurred on July 16. As an accommodation to Becker, the Board voted to provide a transcript of the discussion of the Bankers Trust matter, subject to appropriate deletions under the exemptions of the Sunshine Act. The Board further informed the plaintiff on August 29 that it would make available minutes of the July 16 meeting, also with appropriate deletions.

This dispute centers around three issues under the Sunshine Act. Becker has alleged that the Board violated the Act in withholding notice of the meetings until 3:00 p. m. on the days of the meetings, in closing the meetings when no exemptions of the Act properly applied, and in deleting heavily the transcripts and minutes when exemptions to the Act do not justify such deletions.

Although Becker asserts initially that the Board is required under normal procedures to give notice of a meeting one week in advance, pursuant to 5 U.S.C. § 552b(e)(1), it also recognizes that the Board may use expedited procedures under the Sunshine Act pursuant to 5 U.S.C. § 552b(d)(4).[5]

**2.** Exemption four protects meetings likely to "disclose trade secrets and commercial or financial information obtained from a person and privileged or confidential." 5 U.S.C. § 552b(c)(4).

**3.** Exemption eight covers "information contained in or related to examination, operating, or condition reports prepared by, on behalf of, or for the use of an agency responsible for the regulation or supervision of financial institutions." 5 U.S.C. § 552b(c)(8).

**4.** Exemption ten exempts from public disclosure such meetings likely to

specifically concern the agency's issuance of a subpena [sic], or the agency's participation in a civil proceeding, an action in a foreign court or international tribunal, or an arbitration, or the initiation, conduct, or disposition by the agency of a particular case of formal agency adjudication pursuant to the procedures in section 554 of this title or otherwise involving a determination on the record after opportunity for a hearing.
5 U.S.C. § 552b(c)(10).

**5.** The expedited procedures are as follows:
(4) Any agency, a majority of whose meetings may properly be closed to the public

Nonetheless, the plaintiff maintains that the Board frustrated the letter and spirit of the Act because it did not give notice at the "earliest practicable time," as required by § 552b(d)(4) when it provided the public notice that a meeting would take place after the meeting had already occurred. Because the petitions had been pending since 1978, Becker questions the propriety of expedited procedures absent an emergency.

Plaintiff further contends that the Board has cited no exemption to the Sunshine Act which appropriately governs the particular matter that Becker submitted for discussion and has considered material not required to be discussed by Becker's petition in order to justify closure of the meetings under the Sunshine Act, including unnecessary consideration of confidential commercial information submitted by Bankers Trust, examination of reports prepared by its staff concerning the regulation of financial institutions, and discussion of the pendency of any administrative or legal proceeding against Bankers Trust. Simply put, Becker alleges, its petition merely requested the Board to discuss the general legal and policy questions underlying the sale by commercial banks of third party commercial paper. Even assuming that the Board during portions of the meetings may have considered confidential information, Becker avers that the Board should have opened to the public the portion of the meeting concerned with general legal and policy questions, and then closed the meeting for exempted information. Plaintiff also alleges that because the meetings were not properly closed pursuant to any exemption, the deletions in the minutes and transcripts are illegal as well.

As to the three exemptions, Becker sets forth its views that numerous material issues of fact remain so as to preclude the grant of defendants' motion for summary judgment. Concerning the applicability of exemption four, plaintiff maintains that the Board must prove that the information submitted by Bankers Trust was in fact confidential, that the Board could not have obtained the material pursuant to compulsory process, and that the material actually related to the Becker petition. As to the appropriateness of claiming the exemption for reports prepared by its staff, exemption eight, plaintiff submits that factual questions remain as to whether the staff reports were relevant to the Becker petition and whether the specific information was the sort that warranted confidentiality. Regarding exemption ten, for adjudicatory proceedings, Becker posits that uncertainties exist concerning whether plaintiff actually requested the initiation of formal agency proceedings, whether the Board properly considered plaintiff's request as for a cease and desist order, and whether the Board did discuss administrative or legal proceedings at either of the meetings.

The defendants have moved to dismiss the action pursuant to Fed.R.Civ.P. 12(b)(6) for failure to state a claim for which relief can be granted. Alternatively, the Board maintains that no material factual issues remain and that summary judgment in its favor is mandated.

Defendants argue that Becker cannot prevail on the issue of the notice given for the meeting because the Board's practice is consistent with the dictates of the Sunshine Act. The Board claims that it is entitled to use the expedited procedures available in § 552b(d)(4) because it closes a majority of its meetings pursuant to the exemptions listed in that section. Noting that, under these procedures, the statute nowhere speci-

pursuant to paragraph (4), (8), (9)(A), or (10) of subsection (c), or any combination thereof, may provide by regulation for the closing of such meetings or portions thereof in the event that a majority of the members of the agency votes by recorded vote *at the beginning of such meeting, or portion thereof,* to close the exempt portion or portions of the meeting, and a copy of such vote, reflecting the vote of each member on the question, is made available to the public. . . . *Provided,* That the agency shall, except to the extent that such information is exempt from disclosure under the provisions of subsection (c), provide the public with public announcement of the time, place, and subject matter of the meeting and of each portion thereof *at the earliest practicable time.*

5 U.S.C. § 552b(d)(4) (emphasis added).

fies that advance notice of a meeting is required, the Board justifies its practice of waiting until 3:00 p. m. on the day of the meeting to notify the public by claiming that advance notice would trigger speculation in the financial community concerning the entity or matter that is on the Board's agenda for discussion. Thus, the defendants declare that current practice provides notice at the earliest practicable time, consistent with the statute.

As to the exemptions claimed to warrant closure of the meetings, the Board rests heavily on its argument on exemption ten. It cites portions of Becker's petition that it claims permitted it a reasonable inference that Becker was asking for a cease and desist order against Bankers Trust.[6] It is undisputed that the SIA petition requested such an order. The Board declares, accordingly, that the discussion at the meeting of the two petitions, considered together, was clearly exempt from public scrutiny by exemption ten. As to Becker's suggested factual issues, and as to its claim that the general policy aspects of the question could have been segregated from the discussion of the cease and desist order, the Board justifies its refusal to open any portion of the meeting with the assertion and supporting affidavit that the meetings essentially involved frank discussion of the Board's legal strategy and arguments in any administrative or legal proceedings that it might seek.

The defendants also find support for their action in exemptions eight and four, which permit closure of meetings when confidential information concerning financial institutions is to be discussed. Affidavits submitted to justify closure indicate that the Board's staff undertook an investigation of the Bankers Trust commercial paper activity and that Bankers Trust submitted information to the Board under the expectation of confidence. Both sets of data and information, the Board claims, were important to a thorough understanding of the questions presented by the activities of Bankers Trust, and thus justify closure invoked also under these two exemptions.

### I. Pre–Meeting Notice.

Under normal procedures, the Board was required to notify the public as to the meeting one week in advance. 5 U.S.C. § 552b(e)(1). The Board claims, however, that it is entitled to use the expedited procedure available in 5 U.S.C. § 552b(d)(4), which require notice at the earliest practicable time. This reliance on expedition appears fully warranted by the legislative history of the Sunshine Act and the submitted factual material.

 The legislative background of the Sunshine Act demonstrates that deliberate inclusion in the statute of the expedited procedures was to placate objections by agencies dealing with economic matters, such as the Board, that opening meetings would cause havoc in the financial markets of the nation because of the likely speculation they would trigger. In floor action on the Sunshine Act, Senator Chiles, a sponsor of the bill, responded to a proposed amendment offered by Senator Javits that would exempt, except in limited instances, the Federal Reserve Board from the Act. Sen. Chiles indicated that the expedited procedure in the Act "gives such agencies as the Federal Reserve Board added flexibility in complying with the procedural requirements of the act's provisions." 121 Cong. Rec. 35325 (Nov. 6, 1975). The Senate Report on the Sunshine Act specifically mentions the Board as an agency entitled to use the expedited procedures:

[(d)(4)] will largely apply to agencies which regulate financial institutions, securities, or commodities, and which will often have to conduct their sensitive business in private, and on short notice. It will also apply to agencies whose primary or sole task is to conduct cases of adjudication. Agencies which may possibly issue regulations pursuant to these provisions include the Federal Reserve Board . . . .

---

**6.** The parties do not dispute the contention that if the meetings concerned whether the Board should issue a cease and desist order, then the meeting involved a "particular case of formal agency adjudication" under exemption ten, permitting closure of the meetings from the public.

S.Rep.No.94–354, 94th Cong., 1st Sess. 28–29 (1975). There is no dispute with the statistics that support the Board's use of these procedures. The Board's Annual Report to Congress for 1979 on the Sunshine Act indicates that out of 95 meetings, more than a majority of such meetings are closed pursuant to the exemptions listed in (d)(4). (*See* Plaintiff's Opposition, Exhibit A, at 1–2). It is public record that from 1974 through 1976, 94% of the meetings of the Board could have been properly closed under the appropriate exemptions. (*See* 42 Fed.Reg. 13,297 (1977)). The Board's reliance here on expedited procedures, even absent an emergency, appears wholly proper and permissible.

The question then arises whether the Board violated the Act in its requirement that notice of a meeting is to be given "at the earliest practicable time," and whether the Act indeed requires *advance* notice of a meeting. Becker argues that notice after the occurrence of a meeting is not the earliest practicable time because the Board could announce in advance of the meeting that a meeting will be held and that it may or may not be closed to the public. The Board disputes this claim, alleging that its judgment is sound as to when notice is practicable because of its desire to prevent speculation based on public notice that the Board will meet to discuss a particular subject.

■ The intent of Congress is apparent in the composite legislative history of the Sunshine Act. The bill that passed the Senate directed that notice be given at the "earliest practicable opportunity" under the expedited procedures for closure of meetings. S.Rep.No.94–354, 94th Cong., 1st Sess. 58 (1975). The bill as reported to the House of Representatives read as follows: "[T]he agency shall ... provide the public with announcement of the date, place, and subject matter of the meeting and each portion thereof at the earliest practicable time and in no case later than the commencement of the meeting or portion in question." H.R.Rep.94–880, 94th Cong., 2nd Sess., Part 2, 28 (1976), U.S.Code Cong.

& Admin.News 1976, pp. 2183, 2212. When the House and Senate conferees met to discuss the legislation, they reached a compromise. The Act would reflect the Senate's language that notice be given at the earliest practicable time, striking the House's proviso that notice should be given in no case later than the beginning of the meeting. The Conference Report indicates the basis of this compromise: "While the public announcement required when a meeting is closed using the special procedure under paragraph (d)(4) need only be made at the earliest practicable time, the conferees intend that such announcements be made as soon as possible, which should in few, if any, instances be later than the commencement of the meeting or portion in question." S.Rep.No.94–1178, 94th Cong., 2nd Sess. 17 (1976).

The legislative history therefore mandates that notice of a meeting occur, for the most part, prior to the commencement of the meeting. Congress gave no guidance as to when notice after the commencement of the meeting would be proper except to say that such practice should occur "in few, if any, instances." The question is therefore whether circumstances justified notice after the commencement of the meeting in this particular case, i. e., whether notice at 3:00 p. m. on the day that the meeting has occurred constitutes notice "at the earliest practicable time." As this Court of Appeals has declared:

Congress recognized that there are agency actions for which general public scrutiny may not be appropriate. It noted the need for 'protecting the rights of individuals and the ability of the Government to carry out its responsibilities.' The means Congress chose to accomplish this objective ... was to permit an agency to close a particular meeting on an individual basis because of the adverse impact public proceedings would be likely to have on the rights of the individuals and the ability of the government to function properly.

*Pacific Legal Foundation v. The Council on Environmental Quality*, No. 79–1689 (D.C.

Cir., Op. filed Oct. 27, 1980), slip op. at 10–11. Thus, the decision whether notice was given at the earliest possible time is to be made on a case by case basis, just as are decisions concerning the applicability of particular exemptions under the Act.[7]

■ The Board contends that advance notice that the Board would meet to consider cease–and–desist action against Bankers Trust would have caused speculation on financial markets concerning the stability of that institution. Nowhere in the affidavits submitted by the government is this concern voiced. Moreover, the notice placed in the public reading room at 3:00 p. m. on the day of the July 16, 1980 meeting stated only that the Board would meet to consider "Review of petitions regarding the selling of commercial paper by a State member bank." The same statement is made on the notice after the August 22 meeting. *See* Def. Ex. C, Def. Motion to Dismiss or for Summ. Judgt. No particular institution is named, and there is no mention of cease and desist proceedings. For the Board to support the claim that advance notice of the meeting would have caused damage in financial markets, it must submit detailed, specific affidavits describing with sufficient justification the basis for such a claim, and not rest on conclusory hypotheses. *Cf. Ray v. Turner*, 587 F.2d 1187 (D.C.Cir.1978); *Vaughn v. Rosen*, 484 F.2d 820 (1973), *cert. denied* 415 U.S. 977, 94 S.Ct. 1564, 39 L.Ed.2d 873 (1974). The only statement made in the affidavits submitted to this issue is that of Mr. Allison, Secretary to the Board. He stated, "It is the Board's practice to release to the public by 3:00 p. m. on the day a closed meeting is held pursuant to the Board's expedited procedures a copy of the General Counsel's certification and the votes of the members of the Board to close the meeting." Allison Aff. ¶ 5. This remark does not support a finding that advance notice would have resulted in speculation.

The expedited procedures of the statute contemplate that notice of a particular meeting might occur before the meeting takes place, including notice that the meeting may or may not be closed. Under the Act, the vote to close the meeting will not occur until the meeting begins. Notice of the meeting, however, is to be given at the earliest practicable time. The interpretative guide published concerning the Act states:

> Since the members of the agency are not expected to vote on closing the meeting until the beginning of the meeting itself ... the public announcement will ordinarily precede the vote. Presumably, the announcement may be made by the official responsible for establishing the agenda and will be to the effect that the agency will meet to consider stated subject matter and that the meeting may or may not be closed.

R. Berg & S. Klitzman, *An Interpretative Guide to the Government in the Sunshine Act* 41–42 (1978). Thus, absent extraordinary circumstances (or an instance where notice itself would be exempt under the Act), notice that the Board will have a meeting should occur prior to the commencement of the meeting. In this case, the defendants have not established that notice at 3:00 p. m. was at the earliest practicable time. Where the statement made to the public mentioned neither particular financial institution nor particular likely action, where the defendants submitted no supporting material for their contention that advance notice in this case would cause speculation, and where there is no detailed justification for asserting that such speculation might occur, there is no substantiated rationale for ignoring the plain command and policy of the Sunshine Act that notice be given at the earliest practicable time, e. g., no later than when

---

**7.** It is unnecessary to reach the issue of actual notice save to observe that the defendants asserted that Becker had received actual notice as to both meetings, mooting the question whether notice was given prior to the meeting. Plaintiff's representative conceded that he had

notice of the August 22, 1980 meeting. *See* Affidavit of James H. Schropp ¶ 2 (filed August 25, 1980) but it remains unclear as to whether Becker received notice of the July 16, 1980 meeting.

the agenda for the meeting is established. After such notice pursuant to the expedited procedures, the Board may vote at the beginning to close all or part of the meeting, and the public record of that vote must be released. If the cited exemptions justify closure, then the Board's action will be wholly proper. But in this case, under its particular circumstances, the Act was violated when the Board delayed its notice of the meeting until after it occurred.

## II. Exemptions Justifying Closure.

■ Were the meetings closed properly pursuant to applicable exemptions of the Sunshine Act?

The propriety of the Board's position that closure of both the July 16 and the August 22 meetings was appropriate under exemption ten of the Act rests on the correctness of the Board's determination that the petitions at issue concerning Bankers Trust requested [or could be interpreted as a request] that the Board impose a cease and desist order on that institution's sale of commercial paper for third parties. Were that the essence of the petitions' requests, then the meetings were closed properly under exemption ten.

It is undisputed that the SIA petition to the Board requested that a cease and desist order issue against Bankers Trust. As to the petition of Becker, noted earlier, Becker asked for a ruling that Bankers Trust's activities were illegal.[8] Becker's complaint, filed with its motion for a preliminary injunction, indicates that it petitioned the Board "for a declaratory order ruling that certain activities of Bankers Trust ..., in connection with underwriting and dealing in commercial paper, violated Sections 16 and 21 of the Banking Act of 1933 ...." (Pl.Compl. at 3–4).

Support for the determination that exemption ten appropriately applied to the decision to close the meeting appears in the language of the statute, its legislative history, and the affidavits submitted by the defendants. The Act states that an exemption will apply "where the agency properly determines that such portion or portions of its meeting or the disclosure of such information is likely to" concern exempt material. 5 U.S.C. § 552b(c). The Senate Report indicates that the Congress desired to give agencies some flexibility in determining whether an exemption would apply.

> In making its determination, the agency's [sic] must fairly conclude that the meeting 'can reasonably be expected' to fall within one of the 10 exemptions. Thus an agency wishing to close a meeting need not meet the test of absolute certainty, for it might not be possible to know exactly what information the meeting will disclose. Rather, there must only be a reasonable likelihood, based on the nature of the issue, past experience with similar discussions, and the expressed intent of agency members to raise a sensitive matter.

S.Rep.No.94–354, 94th Cong., 1st Sess., 20 (1975).

The affidavit of the Secretary to the Board, Theodore E. Allison, indicates in its detailed discussion, which recounts the transcripts page by page, that at the two meetings about the legality of Bankers Trust's sale of commercial paper, the question whether the Board should institute cease and desist proceedings against Bankers Trust was of specific concern and that the discussion included information about various legal strategies which could be invoked in the event of adjudicatory proceedings. (Allison Aff. ¶¶ 5–6, Defs. Reply, exhibit B.) The Board cannot be said to have erred in interpreting the request of Becker as a plea to initiate some adjudicatory proceeding against Bankers Trust. The Board could then, and did, reasonably infer that Becker had, as did SIA, requested a cease and desist order, or some kind of adjudicatory proceeding, against Bankers Trust. Accordingly, it was *likely* that an adjudicatory proceeding would be considered by the Board at the meetings. The discussion of whether the Board should seek such an order clearly arose from Becker's request

---

8. See page 380, *supra*.

and was reasonably relevant and closely intertwined to it. The judgment of the Board as to how to constitute its agenda predicated on petitions from outside parties such as those in this case should not be overturned absent a finding that no reasonable grounds existed for the Board's determination.

Becker further argues that despite any justifiable closing of the portion of the meetings concerned with the potential litigation of cease and desist proceedings, the Board should have opened that part of the meetings that dealt with broader policy and legal questions underlying plaintiff's request. Whether the Sunshine Act contemplated segregation of a discussion of a single issue into open and closed portions at the same, or several meetings, is unclear. *See* R. Berg and S. Klitzman, *An Interpretive Guide to the Government in the Sunshine Act* 30 (1978). It is apparent from the material submitted, however, that separation of the meetings in question into closed and open sessions would not have been reasonably possible. The transcripts provided, and the explanatory affidavit of the Board's secretary detail the content discussed, pointing to the conclusion that with little exception, the discussion concerned the bases and implications of an adjudicatory proceeding against Bankers Trust. For example, Mr. Allison indicates that a substantial portion of the August 22 meeting concerned legal arguments the Board might make in any administrative or legal proceeding. (Allison Aff. ¶ 6(c), Def. Reply, Exhibit B.)

Once again examination of the legislative history supports the Board's closure decision. The Senate Report states explicitly, "Public disclosure of an agency's legal strategy in a case before the agency or in the courts could make it impossible to litigate successfully the action." S.Rep.No.94–354, 94th Cong., 1st Sess. 26 (1975). The vast portion of the meetings concerning the activity of Bankers Trust centered on the various legal and policy arguments that would or would not support an adjudicatory action, substantiating the Board's reliance on exemption ten.

Exemptions four and eight justify only brief discussion. Becker contends that types of information requested by the Board concerning its petition were not relevant to the general policy dispute as to whether a state member bank could sell third party commercial paper. To determine the facts underlying the dispute, it sought information from Bankers Trust concerning its sale of commercial paper, which was provided in a letter of April 10, 1980. *See* Allison Aff. ¶ 2, Def. Reply Ex. B. In this letter, Bankers Trust specifically requested that the information remain in confidence. *Id.*

Additionally, the Board's records indicate that its staff visited the Bankers Trust offices in New York on March 20, 1980, to investigate the activities of Bankers Trust. Based on their inquiries and investigation, the staff compiled a report for the Board to utilize at its meetings in discussing the legality of Bankers Trust's sale of commercial paper. *Id.* at ¶ 4. This material was reasonably related to the question presented by Becker's petition. Moreover, the Board's efforts to gather the facts on the question of the legality of Bankers Trust's activities are appropriate to the process of making a reasoned judgment. Both the information submitted by Bankers Trust and the report compiled by the Board's staff are fully exempt under exemptions four and eight, respectively.

If the Board were to promote deliberative, reasoned judgment, it could not be straddled by the bits and drabs of negligible information to which Becker would have restricted its view. Any considered decision would be doomed to vacuity before it commenced to have effect. Here, Becker sought aid from the Board to prevent another's business activity which Becker asserted might substantially affect its own operations. Yet, by insistence on parsimonious selective consideration, it would stultify the full, candid discourse essential to a fair and informed determination. As it pursued the matter, the Board had to be free to transfuse its meeting with the fresh

flow of facts underlying the dispute and not be smothered by the rigid curtailment Becker would seek to impose on its contemplative interchange.

*III. Minutes and Transcripts.*

■ The Board provided to the plaintiff minutes of the July 16 meeting and a transcript of the August 22 meeting, with appropriate deletions for material considered by the Board to be exempt. The Board's justifications for its various claims of exemptions are set out in detail in the Second Allison Affidavit. Rather than generalizing the Board's position, the affidavit details, page by page, the type of material under discussion and the reason for the claimed exemption. The affidavit constitutes sufficient basis to support both the holding above that the meetings were closed properly pursuant to appropriate exemptions, and a determination that the minutes and transcripts provided were edited properly so as to prevent disclosure of exempt information.

Becker having prevailed as to the failure of the Board to comply with the notice requirement contained in the expedited procedures, the question then focuses on the relief, if any, to which the plaintiff is entitled under 5 U.S.C. § 552b(h)(1). Since it has been held, *supra,* that three exemptions (ten, four, and eight) of the Sunshine Act were properly invoked by the Board, it would be pointless to remand the cause to the Board for its further consideration of the instant matter. Accordingly, while plaintiff shall be entitled to a declaratory judgment that the Board violated the notice requirements relevant to the July 16 and August 22 meetings, it is entitled to no more.

Affirming again the foundation of government serving the will of its people, the Government in the Sunshine Act of 1976 assured the public its entitlement to the fullest practicable information regarding the decision–making processes of its government. The oft–quoted words of Mr. Justice Brandeis are well heeded: "Publicity is justly commended as a remedy for social and industrial diseases. Sunlight is said to be the best disinfectant; electric light the most efficient policeman." L. Brandeis, *Other People's Money and How the Bankers Use It* 92 (1914).

In keeping with its goal of more open, responsible and responsive government, shrouds of secrecy are justifiably condemned, and the illumination of most decision–making activities of regulatory agencies firmly establishes the public's right to be present and its right to know.

Yet, Congress wisely recognized that while the commandment of advance notice and openness is vital to free, democratic processes, absoluteness without limited constraints could be highly injurious, if not totally destructive, to the rights of many.

In summary, there are no material issues of fact for resolution. Accordingly, the motion of the defendants for summary judgment is granted in part and denied in part; the plaintiffs are entitled to a declaratory judgment pursuant to the terms of this opinion, and the case is dismissed with prejudice.