**CLARK–COWLITZ JOINT OPERATING AGENCY, Appellant,**

v.

**FEDERAL ENERGY REGULATORY COMMISSION.**

No. 83–2111.

United States Court of Appeals, District of Columbia Circuit.

Argued Oct. 18, 1984.

Decided Oct. 22, 1985.

As Amended Oct. 24, 1985.

George H. Williams, Jr., Washington, D.C., with whom Christopher D. Williams, Washington, D.C., was on brief, for appellant.

Ellen K. Schall, Atty., F.E.R.C., Washington, D.C., with whom Stephen R. Melton, Acting Gen. Counsel, Jerome M. Feit, Sol., and Michael Schopf, Deputy Gen. Counsel for Legal and Administrative Affairs, F.E.R.C., were on brief, for appellee. A. Karen Hill, Atty., F.E.R.C., Washington, D.C., entered an appearance for appellee.

Senator Lawton Chiles (pro se), was on brief, for amicus curiae (Senator Lawton Chiles), urging reversal.

Before ROBINSON, Chief Judge, and WRIGHT, and MIKVA, Circuit Judges.

J. SKELLY WRIGHT, Circuit Judge:

Founded on the principle that "government should conduct the public's business in public," [1] the Government in the Sunshine Act, 5 U.S.C. § 552b (1982), directs that, unless within the compass of one of ten narrowly drawn exceptions, deliberations of a multi-member federal agency must be open to public view. One of those exceptions, Exemption 10, permits an agency to limit disclosure of "information * * * likely to * * * concern * * * the agency's

1. S.Rep. No. 94–354, 94th Cong., 1st Sess. 1 (1975).

participation in a civil action * * *." *Id.* § 552b(c)(10).[2] This case requires us to determine whether and to what extent Exemption 10 allows an agency to refuse to release the transcript of a meeting after the entry of a final, nonappealable judgment in the litigation underlying the agency's initial decision to deny public access to its deliberations.

The case arises out of the unsuccessful efforts of Clark-Cowlitz Joint Operating Agency (CCJOA), a municipal corporation under the laws of the State of Washington, to obtain the transcript of an April 25, 1983 meeting of the Federal Energy Regulatory Commission. Insisting that the matters discussed at the meeting concerned a "civil action" and therefore fell within the purview of Exemption 10, FERC refused to release the transcript, and CCJOA sought review in District Court. *See* 5 U.S.C. § 552b(h)(1). Even though the litigation that was the basis for FERC's initial invocation of Exemption 10 had been finally determined without possibility of appeal, the District Court granted summary judgment in favor of the Commission. Having concluded that the exemption should expire when the policy that undergirds it ceases to be relevant, we now reverse and order the Commission to release the transcript to the public.

### I. BACKGROUND

A. *The Government in the Sunshine Act.*

The Government in the Sunshine Act embodies the enacting Congress' belief that openness in government is an essential concomitant of representative democracy.

*Philadelphia Newspapers v. NRC,* 727 F.2d 1195, 1199 (D.C.Cir.1984). Permitting agencies to cloak the decisional process in secrecy contributes to the erosion of popular confidence in government, dampens well-informed public debate, and diminishes governmental accountability to the electorate. *Common Cause v. NRC,* 674 F.2d 921, 928 (D.C.Cir.1982); S.Rep. No. 94–354, 94th Cong., 1st Sess. 4–5 (1975) (hereinafter cited as *Senate Report* ); H.R.Rep. No. 94–880 (part 1), 94th Cong., 2d Sess. 2 (1976), U.S.Code Cong. & Admin.News 1976, p. 2183 (hereinafter cited as *House Report* ).

In keeping with Congress' unambiguous intent that agencies "conduct their deliberations in public to the greatest extent possible," *Senate Report* at 11, the Act establishes a presumption that meetings should be held in the open and places the burden on the agency to justify any decision to conduct deliberations outside of public view.[3] 5 U.S.C. § 552b(h)(1); *Common Cause v. NRC, supra,* 674 F.2d at 929; *Senate Report* at 19. Only if a matter is likely to fall within one or more of ten specific exemptions may an agency properly elect to close a meeting. *Pan American World Airways v. CAB,* 684 F.2d 31, 35 (D.C.Cir.1982). Given the congressional mandate that "the public is entitled to the fullest practicable information regarding the decisionmaking processes of the Federal Government," Pub.L. No. 94–409 § 2, *codified at* 5 U.S.C. § 552b note, we have repeatedly held that all of the exemptions, including Exemption 10, must be construed narrowly. *See, e.g., Common Cause v. NRC, supra,* 674 F.2d at 932.

---

**2.** Quoted in full, Exemption 10 permits an agency to deny public access to a meeting or a record of a meeting when

the agency properly determines that * * * disclosure of such information is likely to—

\* \* \* \* \* \*

(10) specifically concern the agency's issuance of a subpena, or the agency's participation in a civil action or proceeding, an action in a foreign court or international tribunal, or an arbitration, or the initiation, conduct, or disposition by the agency of a particular case of formal agency adjudication pur-

suant to the procedures in section 554 of this title or otherwise involving a determination on the record after opportunity for a hearing. 5 U.S.C. § 552b(c)(10). This case does not require us to reach any questions concerning the scope of the exemption when the agency bases its refusal to disclose on an "agency adjudication" rather than a "civil action."

**3.** The Act also prescribes rigorous procedures that the agency must follow if it wishes to close a meeting. 5 U.S.C. § 552b(d)(1)–(4).

The Act requires that the agency maintain a complete transcript or electronic recording of any closed meeting, whether or not challenged, unless the meeting is closed pursuant to Exemptions 8, 9(A), or 10. In those instances the agency may opt instead to keep a set of minutes that "fully and clearly describe all matters discussed and * * * provide a full and accurate summary of any actions taken, and the reasons therefor * * *." 5 U.S.C. § 552b(f)(1). Requiring a record of the meeting serves at least three important objectives. First, in the event a court ultimately determines that the agency's decision to close the meeting was unwarranted, a record of the meeting will be preserved for public scrutiny. *See, e.g., Common Cause v. NRC, supra.* Second, even if the agency legitimately and properly anticipates that an exempt matter will arise, not infrequently the meeting will not take its expected course and a record of all or a segregable portion of the deliberations will then be available for disclosure. *Senate Report* at 31. Finally, Congress clearly envisioned occasions when matters, though initially within an exemption, may over time lose their sensitivity. *Id.* at 32. In this context, as with the initial decision to close the meeting, the agency bears the burden of showing that topics discussed in the meeting remain within the letter and purposes of one of the ten exemptions. In the event the agency cannot carry this burden, the minutes or transcript must be disclosed. *Id.*

### B. *History of the Case.*

1. *The municipal preference controversy.* At the heart of this case is a dispute over the correct construction of Section 7(a) of the Federal Power Act, 16 U.S.C. § 791a *et seq.* (1982). The FPA empowers FERC (formerly the Federal Power Commission) to issue licenses, not to exceed 50 years in length, to develop and maintain hydroelectric power projects on the nation's waterways. In issuing licenses, the Commission must give preference to a municipal or state utility provided that its plan, in comparison with that of a private competitor, is "equally well adapted * * * to conserve and utilize in the public interest the water resources of the region * * *." *Id.* § 800(a). As initial licenses began to expire in the 1970's, FERC for the first time faced difficult questions concerning the proper standard for choosing among competitors in *re*licensing applications. Most pressing was the question whether the "municipal preference" applied in relicensing as well as initial licensing proceedings. Potentially at stake was the right to control more than 500 hydroelectric projects valued at a staggering 22 billion dollars.[4]

In September 1978 the Commission gave public notice of the initiation of a generic proceeding to resolve the issue of municipal preference in relicensing. After permitting virtually the entire public and private hydroelectric industry to intervene and conducting a full day of oral argument, the Commission held that the municipal preference applied to all competitive relicensing contests, including those in which the original licensee is among the applicants. *City of Bountiful, Utah et al.,* 11 FERC (CCH) ¶ 61,337 (1980) (*Bountiful*). Representatives of the private utility industry appealed the Commission's decision to the Court of Appeals for the 11th Circuit. Before that court FERC vigorously defended *Bountiful* and the 11th Circuit unanimously affirmed the decision in all respects. *Alabama Power Co. v. FERC,* 685 F.2d 1311 (11th Cir.1982). In February 1983 several private utilities petitioned for writs of certiorari in the Supreme Court of the United States, urging the Court to reverse *Bountiful's* holding that municipal preference applied in all competitive hydroelectric relicensing.

2. *The closed meeting and the request under the Government in the Sunshine Act.* On April 25, 1983 the Commission, which at the time included only one Com-

---

**4.** Note, *Municipal Preference in Hydroelectric Relicensing: Interpretation of Section 7(a) of the* *Federal Power Act,* 52 FORDHAM L.REV. 903 (1984).

missioner who had participated in *Bountiful*, met to discuss possible responses to the petitions for certiorari then pending before the Supreme Court. The meeting was closed to the public. A week earlier, believing that the topics to be discussed were likely to involve the agency's "participation in a civil action," the Commission had voted to hold the meeting in closed session. Affidavit of Lois D. Cashell, Assistant Secretary, FERC, August 22, 1983, *quoting* 5 U.S.C. § 552b(c)(10) and 18 C.F.R. § 375.205(a)(10), Joint Appendix (JA) 78.

On May 3, CCJOA, a municipal corporation, petitioned FERC for a copy of the verbatim transcript of the April 25 meeting. Letter of Christopher D. Williams, May 3, 1983, JA 69. Relying on Exemption 10, the Commission denied the request. Letter of Rachelle Patterson, Director, Division of Public Information, FERC, May 13, 1983, JA 71.

■ CCJOA's interest is not hard to discern.[5] Buoyed by the Commission's holding in *Bountiful*, CCJOA had applied for a license to take over operation of the Merwin Hydroelectric Project on the North Fork of the Lewis River between Clark and Cowlitz Counties in Washington State. The municipality's chief competitor was Pacific Power and Light Company (PP & L), the investor-owned utility currently operating the project. On the authority of *Bountiful's* holding that municipal preference applied in relicensing, on April 28, 1983 an Administrative Law Judge awarded the Merwin license to CCJOA. *Pacific Power & Light Co. and Clark-Cowlitz Joint Operating Agency*, 23 FERC (CCH) ¶ 63,037 (1983).

Within a matter of days, however, the media began to report that the Commission was rethinking its *Bountiful* opinion and might not affirm the ALJ's Merwin decision. *See, e.g.*, Statement of Rachelle Patterson, Director, Division of Public Information, FERC, *quoted in* Washington Post, April 29, 1983, at A2, JA 134. Thus CCJOA's Government in the Sunshine Act request stemmed from its fear that the changed views of the newly reconstituted Commission would significantly diminish the prospects of obtaining the Merwin license.

This fear proved to be well founded. In a brief filed in *support* of the private utilities' petitions for a writ of certiorari to review the 11th Circuit's affirmance of *Bountiful*, the Solicitor General revealed that at the April 25 Commission meeting "a majority of the Commissioners * * * expressed their disagreement with [*Bountiful* and] voted to request the Solicitor General to recommend * * * that the Court grant the petitions for certiorari, vacate the judgment of the court of appeals, * * * and remand the case to that court with instructions to remand to the Commission for further consideration." Brief for FERC in S.Ct. No. 82–8312, at 8, JA 130. Thus the position asserted in the brief makes clear beyond dispute that FERC's stance on municipal preference in relicensing had undergone a 180-degree swing between 1980 and 1983 and that this change had been discussed during the April 25th meeting.[6]

On July 6, 1983 the Supreme Court denied the petition for a writ of certiorari, thus terminating the *Bountiful* litigation. *Utah Power & Light Co. v. FERC*, 463 U.S. 1230, 103 S.Ct. 3573, 77 L.Ed.2d 1415 (1983). Even though the litigation originally advanced as the basis for invoking Exemption 10 of the Sunshine Act was no longer pending, FERC persisted in its view

---

5. A party seeking judicial review of an agency's decision to deny public access to a meeting or to a record of a meeting need not, however, assert any particular interest. The Act explicitly permits "any person" to bring a civil action against the agency. 5 U.S.C. § 552b(h)(1).

6. The Commission's efforts to reverse *Bountiful* were not limited to its support of the private utilities' petitions for certiorari. After certiorari was denied, FERC implemented its new views on municipal preference in its reversal of the ALJ's decision in the Merwin proceeding. Commission Opinion No. 191, 25 FERC (CCH) ¶ 63,037 (1983). We review that decision in a case also decided today, *Clark-Cowlitz Joint Operating Agency v. FERC*, 775 F.2d 366.

that it need not disclose the transcript of the April 25th meeting. *See, e.g.*, Letter of FERC Chairman C.M. Butler III, July 12, 1983, JA 75–76. Having exhausted its administrative remedies, CCJOA sought review in the District Court of FERC's refusal to disclose. *See* 5 U.S.C. § 552b(h)(1).

The District Court granted the Commission's motion for summary judgment. Memorandum Opinion, September 14, 1983, JA 5–15. After inspecting the transcript *in camera*, the court concluded that the matters discussed at the April 25th meeting concerned "possible agency positions in the pending petition for *certiorari*" and that, therefore, the transcript fell within the ambit of Exemption 10 of the Sunshine Act. JA 11. The court also held that, even though the underlying *Bountiful* litigation had terminated upon the Supreme Court's denial of the petitions for certiorari, FERC's discussions concerning that litigation remain exempt from the Government in the Sunshine Act's broad disclosure requirements. To assure that Exemption 10 remains "viable," the court concluded, "discussions that are protected under this exemption must survive long after the litigation has ended." JA 14. "Without such protection," the court believed, "[o]pen and frank discussion concerning litigation strategy would be chilled * * *." *Id.*

## II. ANALYSIS

■ The difficult questions whether and to what extent Exemption 10 reaches general policy deliberations that occur in the course of formulating strategy in pending litigation must await resolution in another case. *Cf. Time Inc. v. United States Postal Service*, 667 F.2d 329, 333 (2d Cir.1981) (similarly finding it unnecessary to determine scope of civil litigation exception). For we have concluded that even if the April 25 meeting was properly closed, continued secrecy no longer serves the underlying purposes of Exemption 10. When the reason for an exemption expires, continued reliance on that exemption to deny disclo-

sure contravenes the Sunshine Act's mandate that agencies "must conduct their deliberations in public to the greatest extent possible." *Senate Report* at 11.

In carving out ten narrow exceptions to the Sunshine Act's otherwise broad disclosure requirements, Congress made clear its assumption that matters initially falling within an exemption may over time lose their exempt status.

> [A] meeting will be closed because it involves matters which are sensitive at the time * * *. Later, however, the discussion's sensitive nature may disappear. An agency must then publicly release the record of its meeting at a later date when [the exemption] no longer applies. * * *

*Senate Report* at 32. *See also* 121 Cong. Rec. 35325 (1975) (statement of Senator Lawton Chiles, principal author and sponsor of the Act) (the bill requires an agency "to keep a transcript or electronic recording of its meetings, and to release such a record when the matter is no longer sensitive"). Indeed, underlying the statutory requirement that agencies make recordings or comprehensive minutes of closed sessions is the objective of preserving agency discussions for later release when appropriate. *Senate Report* at 31–32.

The conclusion that matters discussed in a legitimately closed meeting might later lose their sensitivity and, accordingly, no longer fall within an exemption does not, of course, decide the case. The more difficult task is to determine the underlying purposes of an exemption to pinpoint those characteristics that Congress believed rendered agency deliberations sufficiently sensitive to warrant non-disclosure. More particularly, if Congress intended that an exemption expire once its purpose becomes obsolete, the underlying purposes of Exemption 10 must be the focus of the inquiry.

The District Court concluded that affording Exemption 10 continuing vitality even after termination of the litigation is neces-

sary to foster open and candid discussions within the agency. The legislative history of the Sunshine Act makes clear, however, that focusing on the potentially chilling effects of disclosure to define the temporal reach of Exemption 10 is at odds with the purposes of both that exemption and the Act as a whole. Throughout the course of congressional deliberations various agencies, including FERC's predecessor, the Federal Power Commission,[7] presented apocalyptic visions of the deleterious effect upon government would have on the free exchange of ideas within an agency. The congressional response was twofold. First, focusing on the experience in the 49 states that had already adopted open meeting laws, Congress concluded that for the most part the fears advanced by the agencies were unfounded. *See, e.g., Senate Report* at 6–8; 121 Cong.Rec. 35322 (1975) (statement of Senator Ribicoff) ("Openness does not in fact * * * inhibit free and frank discussions. Discussion need not be less free or frank because the public is there to observe the discussion."). Second, Congress determined that the values inherent in open government vastlys outweighed any concerns, whatever their validity, about "chilling" agency deliberations. *See, e.g.,* 121 Cong.Rec. 35331 (1975) (comments of Senator Weicker). Indeed, unlike the Freedom of Information Act (FOIA), which specifically exempts "predecisional memoranda" from disclosure, 5 U.S.C. § 552(b)(5) (1982), the Government in the Sunshine Act's very objective is to expose predecisional deliberations to public scrutiny. Fully aware of FOIA's concern that "government cannot operate in a fishbowl," S.Rep. No. 89–813, 89th Cong., 1st Sess. 5 (1965), the Congress that enacted the Sunshine Act carefully considered and decided to forego the purported advantages of confidential discussion at agency meetings. *See*

*Common Cause v. NRC, supra,* 674 F.2d at 929.

Rather than embodying a general concern about the potential for chilling agency discussions, Exemption 10 serves a far more circumscribed purpose. The exemption reflects Congress' judgment that the value of openness in government must give way when disclosure would impair an agency's capacity effectively to conduct civil litigation. As summarized in the Senate Report, Exemption 10 guards against the possibility that "[p]ublic disclosure of an agency's legal strategy in a case before [a court might] make it impossible to litigate successfully the action." *Senate Report* at 26; *see also House Report* at 12–13.

Measured against Exemption 10's underlying purpose, the conclusion is inevitable that an agency ordinarily must release the record of its deliberations once the litigation that originally was the basis for invoking the exemption has terminated. The relevant inquiry is not, as FERC maintains, whether the prospect of subsequent public scrutiny might cast a pall over candid discussion of the various alternatives open to the agency in the litigation. Brief for respondent at 19. Rather, the appropriate question is whether disclosure of the record of the deliberations would seriously undermine the agency's posture in "a particular case of adjudication." *Senate Report* at 26. At risk of stating the obvious, we observe that discussions of tactical options, which might devastate the agency's litigation posture if revealed while the case is in the planning stages [8] or actually pending, virtually without exception can cause no harm at all if disclosed after the case has gone to judgment and the appellate process has been completed.

We do not wish to imply that in every imaginable instance Exemption 10 falls out of the statute the moment the underlying

---

7. *Hearings on H.R. 10315 and 9868 Before a Subcommittee of the House Committee on Government Operations,* 94th Cong., 1st Sess. 504–505 (1975).

8. The legislative history makes clear that Exemption 10 may be available even before actual initiation of the litigation. *Senate Report* at 26. *See also* R. BERG & S. KLITZMAN, AN INTERPRETATIVE GUIDE TO THE GOVERNMENT IN THE SUNSHINE ACT 27 (1978).

litigation draws to a close. There may be some matters discussed in the course of a particular litigation the disclosure of which would thwart effective litigation in other cases. Revelation of an agency's settlement policy, for example, would have a potentially debilitating effect on the agency's position in other, entirely separate actions. But topics that transcend any single litigation undoubtedly will be rare, and none are present in the case before us.[9]

Having reviewed the transcript of the April 25th meeting, we conclude that denying the public access to the record of the meeting no longer furthers the policies served by Exemption 10. Permitting the Commission to continue to shroud the meeting in secrecy clearly does not protect the Commission's ability effectively to conduct the *Bountiful* litigation. For that litigation ended when the Supreme Court denied the petitions for certiorari in *Utah Power.* Nor can we say that the topics discussed at the meeting, if disclosed, would "make it impossible to litigate successfully" any other action. *Senate Report* at 26. The entire discussion pertained to the 11th Circuit's opinion in *Alabama Power,* the municipal preference question, the possibility of using other cases to implement the Commission's changed position on that issue,[10] and the potential impact on the Commission's credibility inherent in the exercise of each of its various options. Disclosure of none of these matters would

disserve Exemption 10's goal of guarding against untimely revelation of an agency's litigation tactics.

### III. CONCLUSION

Having determined that FERC may no longer rely on Exemption 10 of the Government in the Sunshine Act, we reverse the judgment of the District Court and remand the case to that court with instructions to order the Commission to release the transcript of the April 25th meeting to the public. Because CCJOA's request was limited to discussions concerning *Utah Power & Light Co. v. FERC, supra,* S.Ct. No. 82–1312, we do not require the Commission to disclose the record of its deliberations on *McDowell County Consumers Council, Inc. v. American Electric Power Co.,* Docket No. 892–006, an entirely distinct case discussed at the same meeting.

*Reversed and remanded.*

---

**9.** We do not believe that disclosure of the Commissioners' candid observations about the quality of the 11th Circuit's opinion could possibly undermine FERC's future ability effectively to conduct litigation before that or any other court. Thus, no less than the rest of the transcript, those comments are not within Exemption 10.

**10.** On a few occasions during the course of the meeting various Commissioners alluded to the Merwin licensing proceeding. That litigation is still pending and will remain so until final disposition of the petitions, if any, for rehearing *en banc* or for a writ of certiorari or until the period for filing such petitions has run. While the posture of the present case has not required us comprehensively to define the reach of Exemption 10 during the pendency of a litigation,

we have no difficulty in concluding that the sporadic comments about the Merwin proceeding are not exempt. Because the Commission has not explicitly argued that references to Merwin should receive special treatment, hardly can it be said that it has carried its statutory burden of justifying non-disclosure. *See* 5 U.S.C. § 552b(h)(1). In any event, the *de minimis* comments about Merwin concerned the possibility of using that proceeding as a vehicle for reversing *Bountiful* in the event the Supreme Court denied certiorari in *Utah Power.* That possibility has come to pass. Because FERC's position in the Merwin license application is a matter of public record already, deleting before-the-fact references to that position from the transcript of the April 25th meeting would be a pointless exercise.