**CLARK–COWLITZ JOINT OPERATING AGENCY, Appellant**

v.

**FEDERAL ENERGY REGULATORY COMMISSION.**

No. 83–2111.

United States Court of Appeals, District of Columbia Circuit.

Argued March 31, 1986.

Decided Aug. 15, 1986.

George H. Williams, Jr., with whom Christopher D. Williams, Washington, D.C. was on brief, for appellant.

Marleigh D. Dover, Atty., Dept. of Justice, with whom Stephen R. Melton, Acting Gen. Counsel, Jerome M. Feit, Sol., Michael

Schopf, Deputy Counsel and Ellen K. Schall, Atty., F.E.R.C., Washington, D.C. were on brief for appellee. A. Karen Hill, Atty., F.E.R.C., Washington, D.C. entered an appearance for appellee.

Senator Lawton Chiles, Washington, D.C., pro se, was on brief for amicus curiae, Senator Lawton Chiles, urging reversal.

Before ROBINSON, MIKVA, EDWARDS, GINSBURG, BORK, SCALIA, STARR, SILBERMAN and BUCKLEY, Circuit Judges, and WRIGHT, Senior Circuit Judge.

Opinion for the Court filed by Circuit Judge SILBERMAN.

Concurring opinion filed by Circuit Judge SPOTTSWOOD W. ROBINSON, III.

Dissenting opinion filed by Senior Circuit Judge J. SKELLY WRIGHT, in which Circuit Judge MIKVA joins.

SILBERMAN, Circuit Judge:

This case concerns the scope to be afforded Exemption 10 of the Government in the Sunshine Act, 5 U.S.C. § 552b(c)(10) (1982). The Sunshine Act generally requires federal agencies to open their meetings to the public; Exemption 10 provides, however, that an agency may close a meeting when, *inter alia*, it is likely to "specifically concern ... the agency's participation in a civil action...." *Id.*[1] Appellant Clark-Cowlitz Joint Operating Agency, a municipal corporation in the State of Washington, initiated this action below against the Federal Energy Regulatory Commission. Clark-Cowlitz sought an order permitting it to inspect the transcript of an April 25, 1983 Commission meeting that had been closed to the public pursuant to Exemption 10. Sustaining the Commission's position in full, the district court awarded summary judgment against Clark-

Cowlitz. Because we agree that Exemption 10 was properly invoked in this case, we now affirm the district court's decision.

## I.

In 1980, the Commission issued a decision on an important issue of statutory construction arising under the Federal Power Act: whether the preference accorded to municipalities in hydroelectric licensing proceedings, *see* 16 U.S.C. § 800(a) (1982), applies in *relicensing* proceedings (*i.e.*, where a private utility's original fifty-year license has expired and a municipality seeks to take over the license). In *City of Bountiful, Utah*, 11 FERC (CCH) ¶ 61,337 (1980) (*Bountiful*), the Commission concluded that it did. That decision was challenged by private utilities but nonetheless affirmed by the Eleventh Circuit in *Alabama Power Co. v. FERC*, 685 F.2d 1311 (11th Cir.1982). The private utilities then sought review in the Supreme Court by petitions for writ of certiorari.

The Commission scheduled a meeting for April 25, 1983 to discuss its response to the certiorari petitions. Shortly before that date, the Commission's members voted to close the meeting because its agenda concerned the agency's "participation in a civil action" and thus fell within the terms of Sunshine Act Exemption 10. *See* 48 Fed. Reg. 17,432 (1983) (providing public notice of this determination). Although the meeting was closed to the public, the Commission transcribed the meeting's discussion. *See* 5 U.S.C. § 552b(f)(1) (1982). On May 3, Clark-Cowlitz requested access to this transcript. The Commission denied this request, again relying upon Exemption 10.

At the April 25 meeting the Commission, in fact, had decided not to defend the *Bountiful* decision in the Supreme Court. The composition of the Commission had

---

1. Exemption 10 provides in full that an agency may close a meeting to prevent the disclosure of information likely to

   specifically concern the agency's issuance of a subpena, or the agency's participation in a civil action or proceeding, an action in a foreign court or international tribunal, or an

arbitration, or the initiation, conduct, or disposition by the agency of a particular case of formal agency adjudication pursuant to the procedures in [5 U.S.C. § 554] or otherwise involving a determination on the record after opportunity for a hearing.

5 U.S.C. § 552b(c)(10) (1982).

changed, and a majority wished to *support* the petitions for certiorari pending before the Court. In a brief submitted on behalf of the Commission, the Solicitor General of the United States disclosed this development, and accordingly asked that the Court of Appeals' decision be vacated. The Supreme Court, however, denied certiorari on July 6. *Utah Power & Light Co. v. FERC,* 463 U.S. 1230, 103 S.Ct. 3573, 77 L.Ed.2d 1415 (1983).

Clark-Cowlitz then renewed its request for the transcript of the April 25 meeting, and again was denied on the basis of Exemption 10. The Chairman of the Commission affirmed this denial, maintaining that all portions of the April 25 meeting were exempt and that disclosure would be contrary to the public interest:

> Full and candid discussion of litigation strategy demands that Commissioners and staff have the freedom to raise and consider a wide range of alternatives. If initial theories and hypotheses and preliminary observations are subject to public scrutiny, there may well be a chilling effect on future strategy discussions and harm to the Commission's future litigation posture before the courts.

Letter from Chairman C.M. Butler III to Christopher D. Williams, Esq. (July 12, 1983) (Joint Appendix at 75, 76).

Clark-Cowlitz then brought this suit. After conducting an *in camera* inspection of the transcript, the district court granted the Commission's motion for summary judgment. Memorandum Opinion, No. 83–1842 (D.D.C. Sept. 14, 1983). The district court concluded that the April 25 meeting "involved open and candid discussions concerning the possible agency positions [relating to] the pending petition[s] for *certiorari*," *id.* at 7, and thus fell squarely within the purview of Exemption 10.

On appeal, a panel of this court reversed the district court's decision. *Clark-Cowlitz Joint Operating Agency v. FERC,* 775 F.2d 359 (D.C.Cir.1985). It held that the protections of Exemption 10 terminate upon the conclusion of the litigation for which the exemption is invoked. *Id.* at 363–65. Because the Supreme Court had denied certiorari in the *Bountiful* litigation, the panel concluded that Exemption 10 would no longer support the Commission's refusal to provide the transcript. *Id.* Subsequently, the full court voted to rehear the case *en banc* and consequently vacated the panel decision. We now affirm the district court's disposition of this case.

## II.

The Government in the Sunshine Act embodies the general policy that federal agencies should "conduct their meetings in the open, rather than behind closed doors." S.Rep. No. 354, 94th Cong., 1st Sess. 1 (1975) (Senate Report). Nonetheless, the Act contains ten specific exemptions from this requirement of openness. *See* 5 U.S.C. § 552b(c) (1982). These exemptions serve to "protect the ability of the Government to carry out its responsibilities...." Senate Report at 11. We deal here only with Exemption 10, which permits an agency to close meetings (and withhold the transcript or minutes thereof)[2] dealing with its participation in litigation. We conclude that the Federal Energy Regulatory Commission properly invoked Exemption 10 in this case.

As the district court found, the Commission's April 25 meeting concerned the posture the agency would adopt in litigation pending before the Supreme Court. "The Commissioners met to discuss all the available options and possible repercussions with counsel and came to a final conclusion on the agency's litigation strategy."

---

**2.** The Act requires an agency to "maintain a complete transcript or electronic recording adequate to record fully the proceedings of each meeting, or portion of a meeting, closed to the public," or, in the case of several exemptions (including Exemption 10), merely to keep a set of minutes. 5 U.S.C. § 552b(f)(1) (1982). (In this case, the Commission maintained a verba-

tim transcript of the meeting, foregoing its option to keep minutes instead). The agency must then make the transcript or set of minutes available to the public, "except for such item or items [on the agenda] as the agency determines to contain information which may be withheld under [an exemption]." *Id.* § 552b(f)(2).

Mem.Op. at 11. As such, these matters fall within the plain terms of Exemption 10, and the agency was privileged to withhold the transcript from public scrutiny.

■ Clark-Cowlitz nevertheless argues that at the April 25 meeting the Commissioners decided to reverse the *Bountiful* decision, and thus that the meeting strayed beyond exempt "litigation strategy" into what it contends were non-exempt "policy deliberations." We think, however, that the appellant interprets Exemption 10 too narrowly. As a predicate to determining *how* to respond to the certiorari petitions filed against the Commission, the Commissioners necessarily discussed *what result* they sought. It could hardly have been otherwise: an attorney cannot discuss litigation tactics with his client in a coherent manner without touching upon his client's substantive objectives. Nor is it unusual for a discussion focused on litigation tactics to lead a party to modify its substantive position. The commencement of litigation, as well as its various twists and turns, often induces parties to concentrate sharply on policy objectives and, not infrequently, to see those objectives in a different light. For purposes of Exemption 10, then, there could be no hard-and-fast distinction between litigation strategy and policy questions; what matters is simply that the agency deliberations in question deal with "the agency's participation in a civil action." 5 U.S.C. § 552b(c)(10). The Commission's April 25 meeting manifestly satisfies that test.[3]

■ We also reject Clark-Cowlitz's contention that the Commission was required to release the transcript once the litigation discussed at the April 25 meeting had terminated. No such requirement can be found in the language of Exemption 10. In fact, a *different* exemption, Exemption 9, contains an express temporal limitation. It covers information "the *premature* disclosure of which" would engender financial instability or speculation or otherwise "be likely to significantly frustrate the implementation of a proposed agency action." 5 U.S.C. § 552b(c)(9) (1982) (emphasis added). We do not believe that Congress would have written an express temporal limitation into Exemption 9 and yet have intended a similar (unwritten) limitation to apply to Exemption 10. The legislative history of the Act is not to the contrary. Clark-Cowlitz relies upon a passage from the Senate Report on the bill, which notes that certain information may be exempt at first but later lose its sensitive nature and become non-exempt. *See* Senate Report at 32. We think it plain, however, that this passage was intended to refer only to Exemption 9. *See id.* (referring to "matters which are sensitive at the time, such as the regulation of financial institutions, that would cause financial speculation if disclosed prematurely"). In fact, since the version of the bill which the Senate Report described did not even require agencies to maintain a transcript or set of minutes when it closed a meeting pursuant to Exemption 10, *see* S. 5, 94th Cong., 1st Sess. (1975), subsequent disclosure could not have been contemplated.

■ Requiring an agency to disclose its tactical discussions upon the conclusion of

---

3. There is no suggestion here that the Commission used the pending litigation as a subterfuge to discuss non-exempt items in a closed session or that it unfairly manipulated the agenda of its April 25 meeting. As the district court found, the Commissioners' discussion of the municipal preference issue was intertwined with their discussion of possible responses to the pending certiorari petitions. *See A.G. Becker, Inc. v. Board of Governors of Fed. Reserve Sys.,* 502 F.Supp. 378, 386–87 (D.D.C.1980). We note, moreover, that Clark-Cowlitz does *not* argue that there were any discrete portions of the April 25 meeting that are non-exempt, *i.e.,* that

the Commission must disclose segments of the transcript. In any event, under the Sunshine Act

[a]gencies need not edit a transcript or electronic recording of the Commission's discussion of a particular matter word by word so as to make abbreviated portions of the record of the meeting available to the public. Where sensitive matters are an integral part of the record of the discussion of [an item on the agenda], no part of the record need be made public.

Senate Report at 31.

the litigation, moreover, would frustrate Exemption 10's purpose. Exemption 10, like the attorney-client privilege in civil litigation, *see, e.g., Mead Data Central, Inc. v. U.S. Dep't of Air Force,* 566 F.2d 242, 252 (D.C.Cir.1977), which it quite clearly reflects, serves to facilitate the candid exchange of views between client and counsel necessary for effective participation in adversary proceedings. Exposing such communications *ex post* would tend to inhibit free and open discussion nearly as much as would contemporaneous disclosure.[4] Thus, for instance, in *FTC v. Grolier Inc.,* 462 U.S. 19, 103 S.Ct. 2209, 76 L.Ed.2d 387 (1983), the Supreme Court indicated that attorney work-product immunity survives beyond the particular litigation giving rise to it. *Id.* at 25–26, 103 S.Ct. at 2213. In a concurring opinion that bears forcefully on the question at issue here, Justice Brennan observed:

> The invasion of "[a]n attorney's thoughts, heretofore inviolate," and the resulting demoralizing effect on the profession, are as great when the invasion takes place later rather than sooner.

More concretely, disclosure of work product connected to prior litigation can cause real harm to the interests of the attorney and his client even after the controversy in the prior litigation is resolved. Many Government agencies, for example, deal with hundreds or thousands of essentially similar cases .... It would be of substantial benefit to an opposing party (and of corresponding detriment to an agency) if the party could obtain work product generated by the agency in connection with earlier, similar litigation against other persons.... [H]e could gain insight into the agency's general strategic and tactical approach to deciding when suits are brought, how they are conducted, and on what terms they may be settled.

*Id.* at 30–31, 103 S.Ct. at 2216 (Brennan, J., concurring in part and concurring in the judgment) (citations and footnote omitted).

■ Given the language of the statute, as informed by these compelling policy considerations, we hold that Exemption 10 is not extinguished at the conclusion of the litigation for which it is invoked.[5] We thus

---

**4.** Contrary to the dissent's suggestion, *see* Diss.Op. at 504–505, it does not follow from Congress' refusal to create a general Sunshine Act exemption for predecisional deliberations that specific types of deliberations (such as those relating to "the agency's participation in a civil action") are not exempted. Likewise, Congress' rejection of arguments that the Sunshine Act's general provision for open meetings would inhibit agency deliberations does not mean that Congress ignored such "chilling effects" in enacting particular exemptions.

**5.** Clark-Cowlitz also suggests in passing that the Commission's determination *not to exercise its* discretion to release the transcript (despite the applicability of Exemption 10) should be reversed by this court. *See* Brief of Appellant at 13, 19 n. 12. Assuming *arguendo* that the issue has been properly raised in this appeal, we reject the suggestion that such agency determinations are judicially reviewable. The Act states that its exemptions preclude disclosure "[e]xcept in a case where the agency finds that the public interest requires otherwise...." 5 U.S.C. § 552b(c) (1982). The Senate Report explains that this language indicates that "closing a meeting on [the basis of an exemption] is permissive, not mandatory.... [A]n agency may still decide that the public good achieved by opening the meeting outweighs the advantages to be gained by closing it." Senate Report at 20. To be sure, the House Report states that "[t]his balancing procedure is to be performed by the agency in the first instance," H.R.Rep. No. 880, 94th Cong., 2d Sess. 9, U.S.Code Cong. & Admin.News 1976, pp. 2183, 2190 (1976), and a panel of this Circuit has (in dictum) interpreted this comment as anticipating ultimate judicial review. *See Philadelphia Newspapers, Inc. v. NRC,* 727 F.2d 1195, 1203 n. 6 (D.C.Cir.1984). We cannot believe, however, that Congress intended the courts to review *both* an agency's determination that an exemption applies in particular circumstances *and* its refusal to find that disclosure is nonetheless warranted by the "public interest." That interpretation would propel the courts into the standardless realm of judging whether the public good in openness "outweighs" an agency's interest in confidentiality in various contexts—wholly independent of the balance already struck by Congress in the Act's express exemptions. One oblique sentence in the House Report, not endorsed in the Senate Report or the Conference Report, is simply too slender a reed upon which to rest such an untoward result. We therefore hold that 5 U.S.C. § 552b(c)'s "public interest" exception to the Act's exemptions is addressed to the unreviewable discretion of the agency.

affirm the decision of the district court in all respects.

*So ordered.*

SPOTTSWOOD W. ROBINSON, III, *Circuit Judge,* concurring:

Nine months ago, when I joined in the panel opinion,[1] I felt that the central question in this case was difficult and very close. Reconsideration by the full court has not mitigated the problem, but it has altered my view on the outcome proper. Now, with the aid of additional research, argument and deliberation, I am convinced that the conclusions today reached by a majority of the court more accurately reflect the congressional objectives underlying Exemption 10 of the Government in the Sunshine Act,[2] and more likely effectuate the legislative intent in regard to the duration of that exemption. Accordingly, I concur in the majority opinion.

J. SKELLY WRIGHT, *Senior Circuit Judge,* with whom MIKVA, *Circuit Judge,* joins, *dissenting:*

I believe the majority's broad construction of the litigation exemption to the Sunshine Act is inconsistent with the spirit of the Act and with this court's established approach to such questions. In my view, the panel opinion more accurately reflects the intent of Congress as to the scope of the Sunshine Act. Therefore, I must respectfully dissent.

The Sunshine Act, 5 U.S.C. § 552b (1982), embodies the belief of Congress that openness in government is essential to representative democracy. *See Philadelphia Newspapers, Inc. v. NRC,* 725 F.2d 1195, 1199 (D.C.Cir.1984). Secrecy contributes to erosion of popular confidence in government, dampens well-informed public debate, and diminishes governmental accountability to the electorate. *Common Cause v. NRC,* 674 F.2d 921, 928 (D.C.Cir.1982); S.Rep. No. 354, 94th Cong., 1st Sess. 4–5 (1975) (hereinafter *Senate Report* ); H.R.

Rep. No. 880 (part 1), 94th Cong., 2d Sess. 2 (1976), U.S.Code Cong. & Admin.News 1976, 2184 (hereinafter *House Report* ).

The Act establishes a presumption that meetings should be held in the open and places the burden on the agency to justify any decision to conduct deliberations outside of public view. 5 U.S.C. § 552b(h)(1); *Common Cause, supra,* 674 F.2d at 929; *Senate Report* at 19. Only if a matter falls within one of ten specific exemptions may an agency properly elect to close a meeting. *Pan American World Airways, Inc. v. CAB,* 684 F.2d 31, 35 (D.C.Cir.1982).

We have repeatedly held that all the exemptions, including the litigation exemption, must be construed narrowly. *See Common Cause, supra,* 674 F.2d at 932; *Philadelphia Newspapers, supra,* 727 F.2d at 1199; *see also Senate Report* at 2 (exemptions "narrow" in scope). To ensure that agencies "conduct their deliberations in public to the greatest extent possible," *Senate Report* at 11, as Congress intended, we must carefully limit the scope of Exemption 10 to its underlying purpose—protection of the government's ability to conduct ongoing litigation. Once litigation has ended, agencies must release the transcripts of any prior meetings closed on account of that litigation.

The majority asserts that Exemption 10 "serves to facilitate the candid exchange of views between client and counsel necessary for effective participation in adversary proceedings. Exposing such communications *post hoc* would tend to inhibit free and open discussion nearly as much as would contemporaneous disclosure." Majority opinion (maj. op.) at 502. The majority offers no evidence, however, that concern over possible "chilling effects" on agency discussion played any part in the congressional adoption of this exemption. In fact, the legislative history is to the contrary. Congress repeatedly rejected such arguments. *See, e.g., Senate Report* at 6–8; 121 Cong.Rec. 35322 (1975) (statement of

---

1. *Clark-Cowlitz Joint Operating Agency v. FERC,* 249 U.S.App.D.C. 309, 775 F.2d 359 (1985), *vacated,* 788 F.2d 762 (D.C.Cir.1986) (order).

2. 5 U.S.C. § 552b(c)(10) (1982).

Senator Ribicoff) ("Openness does not in fact hurt the quality of discussion or inhibit free and frank discussions."); *id.* at 35331 (statement of Senator Weicker). Congress enacted Exemption 10 solely to protect the government's ability to conduct litigation. *See Senate Report* at 26; *House Report* at 12–13. Appellee itself notes that Congress limited the Act's verbatim transcript requirement to meetings closed under Exemptions 8, 9 and 10. Brief for appellee at 20. If we assume, for the sake of argument, that this limitation reflects congressional concern over the possible chilling effects of such transcripts, we must also note that the limitation indicates a specific *lack* of concern on this point for Exemption 10. Nowhere in Exemption 10 or its legislative history is concern over "chilling effects" to be found.

Moreover, the majority's view that Exemption 10 "clearly reflects" the attorney-client privilege flies in the face of congressional resolve to avoid such a broad exemption from the Sunshine Act. Despite the urging of several federal agencies, *see Common Cause, supra,* 674 F.2d at 929, Congress refused to amend the Sunshine bill to include an exemption similar to the "predecisional memorandum" exemption found in the Freedom of Information Act (FOIA), 5 U.S.C. § 552(b)(5) (1982). The Supreme Court had held that FOIA's "predecisional memoranda" exemption incorporates an exemption for the attorney-client privilege. *See NLRB v. Sears, Roebuck & Co.,* 421 U.S. 132, 154, 95 S.Ct. 1504, 1518, 44 L.Ed.2d 29 (1974). By refusing to insert the FOIA exemption in the Sunshine Act, Congress also refused to include a full-fledged attorney-client privilege exemption.* For the same reason, the majority's reliance on *FTC v. Grolier Inc.,* 462 U.S. 19, 103 S.Ct. 2209, 76 L.Ed.2d 387 (1983), is misplaced. In *Grolier* the Supreme Court interpreted the precise FOIA exemption Congress refused to make a part of the

Sunshine Act. *Id.* at 20, 103 S.Ct. at 2210–11. Regardless of the persuasiveness of Justice Brennan's analysis of the attorney-client privilege in *Grolier,* the case now before this court does not concern that privilege. The *Grolier* analysis cannot effectively illuminate the contours of the Sunshine Act's Exemption 10.

The majority is also reluctant to adopt my reading of Exemption 10 because it finds it unlikely "that Congress would have written an express temporal limitation into Exemption 9 and yet have intended a similar (unwritten) limitation to apply to Exemption 10." Maj. op. at 501. But Exemption 9 does not truly contain any "express temporal limitation." That exemption protects certain information "the premature disclosure of which" would harm certain financial interests or frustrate proposed agency action. The words "premature disclosure" are words of definition—they describe the material to be protected by the exemption. They do not, on their face, impose a time limit. Exemption 9 does not expressly say that after disclosure of such information would no longer be harmful the agency must release the no-longer-sensitive material. Such an *inference* is entirely reasonable, of course, especially in view of the legislative history of the Act. *See Senate Report* at 32. But it is nonetheless an inference rather than an express provision. The absence of temporal words of definition in Exemption 10 does not bar the same kind of inference for that exemption.

The majority maintains, however, that the legislative history of the Act refers to time limits only for Exemption 9. For that proposition the majority quotes a portion of this passage from the Senate Report:

> [A] meeting will be closed because it involves matters which are sensitive at the time, such as the regulation of finan-

---

* This is not to suggest, of course, that Congress did not exempt certain types of predecisional discussions from the effects of the Sunshine Act. Exemption 10, for example, clearly encompasses some such discussions. Nonetheless, in light

of the explicit refusal of Congress to include an exemption that would have fully embraced the attorney-client privilege, the majority's analogy between Exemption 10 and the attorney-client privilege seems particularly inapt.

cial institutions, that would cause financial speculation if disclosed prematurely. Later, however, the discussion's sensitive nature may disappear. An agency must then publicly release the record of its meeting at a later date when [the exemption] no longer applies.

*Senate Report* at 32, quoted in part in maj. op. at 502. Admittedly, the only explicit reference in this passage is to a matter covered by Exemption 9. But the language of the passage ("such as") is clearly exemplary, rather than exhaustive. It applies to any discussion whose "sensitive nature may disappear," not only to those discussions covered by Exemption 9. The passage is entirely consistent with the conclusion that Congress intended such a time limit to apply to Exemption 10 as well.

The Senate Report makes the intent behind the exemption clear:

> To fall within the provisions of [the litigation exemption] the discussion must concern a particular case of adjudication. If the agency discusses a particular series of cases, each of which meets the requirements of [the exemption], the meeting may also be closed. The [exemption] would not apply when an agency discusses its adjudication policies in general, such as the policy that should be adopted towards all those that may violate a particular law.

*Senate Report* at 26. Leaving aside any hypothetical chilling effects, once the "particular case" under discussion in a closed meeting has been resolved, the agency no longer has any information to protect other than its discussion of "adjudication policies in general." This is the sort of discussion that Congress explicitly refused to allow agencies to carry on in secret. In any event, neither FERC nor the majority suggest that any such general litigation policies are involved here. We are left to wonder what it is that FERC feels must be protected.

In the process of reading out of Exemption 10 any time limit on withholding litiga-

tion meeting transcripts, the majority also extends the exemption to cover policy deliberations conducted in conjunction with litigation strategy. Although the panel opinion did not reach this complicated issue, I must disagree with the majority nevertheless. Exemption 10 should have only limited applicability to general policy deliberations that occur in the course of formulating strategy in pending litigation. Unquestionably, as the majority observes, it is not "unusual for a discussion focused on litigation tactics to lead a party to modify its substantive position." Maj. op. at 502. But that is not an argument for keeping the discussion secret beyond the time necessary to protect the agency's position in the pending litigation. On the contrary, given the Sunshine Act's unequivocal congressional command for openness in government, the inevitable entanglement of general policy discussion and legal strategizing argues in favor of a time limit on Exemption 10. Although the Sunshine Act would not demand *immediate* disclosure of a substantive change in policy if that disclosure would damage the agency's litigation position, the public retains a powerful interest in ultimately knowing how and why that substantive policy change came about. Exemption 10 should shield what would otherwise be public only to the extent necessary to protect litigation strategy. The majority correctly notes that there is no evidence of "subterfuge" in FERC's policy reversal. But the agency's intent should not be determinative; good faith is no substitute for full disclosure.

As I noted in the panel opinion, 775 F.2d 359, 364–65 (D.C.Cir.1985), *vacated,* 788 F.2d 762 (D.C.Cir.1986) (*per curiam* ), it is important to point out that Exemption 10 does not vanish in every case the moment the underlying litigation draws to a close. Some matters may be discussed in the course of a particular litigation the disclosure of which would thwart effective litigation in other cases. Revelation of an agency's strategy for a series of similar cases, for example, could have a debilitating ef-

fect on the agency's overall litigation policy. *See Senate Report* at 26. But topics that transcend any single litigation certainly will be less common than more specific topics. The transcript Clark-Cowlitz seeks to obtain here contains nothing that will hinder FERC by its disclosure.

For these reasons, I would reverse the judgment of the District Court and remand the case to that court with instructions to order the Commission to release to the public the transcript of the April 25th meeting.

I respectfully dissent.