David L. WILKINSON, Plaintiff,

v.

LEGAL SERVICES CORPORATION,
Defendant.

Civ. A. No. 91–0889 (JHG).

United States District Court,
District of Columbia.

June 21, 1994.

Reuben B. Robertson, Ingersoll and Bloch, Chartered, Washington, DC, for plaintiff David L. Wilkinson.

Charles Samuel Fax, Niccolo N. Donzella, Shapiro and Olander, Baltimore, MD, for defendant Legal Services Corp.

Theodore C. Hirt, Richard Glen Lepley, U.S. Dept. of Justice, Civil Div., Washington, DC, for intervenor-defendant U.S.

## MEMORANDUM OPINION AND ORDER

JOYCE HENS GREEN, District Judge.

Plaintiff, David L. Wilkinson ("Wilkinson"), filed a three-count second amended complaint in this action against defendant, Legal Services Corporation ("LSC"), pursuant to the Government in the Sunshine Act ("Sunshine Act"), codified at 5 U.S.C. § 552b, the United States Constitution, and the by-laws of the LSC. Presently pending are the parties' cross-motions for summary judgment and the motion of intervenor-defendant, the United States of America ("United States" or "Government"), for summary judgment as to Count Two. For the reasons expressed below, plaintiff's motions are granted as to Counts I and II, defendant's motions are denied as to Counts I and II, intervenor-defendant's motion as to Count II is denied, and Count III is mooted by the actions taken herein.

### I. Background

The facts are basically not in dispute. The LSC is a private, non-profit, tax-exempt corporation established by the Legal Services Corporation Act of 1974 ("LSC Act"), codified at 42 U.S.C. § 2996b. It provides financial support for legal assistance in certain non-criminal proceedings to persons throughout the United States who cannot otherwise afford legal assistance. The LSC Act provides that the LSC is subject to the provisions of the Sunshine Act, *see* 42 U.S.C. § 2996c(g), and, with slight modification, the LSC is subject to the procedural regulations of the Sunshine Act, codified at 45 C.F.R. §§ 1622.1–1622.10.

Plaintiff began serving as the Inspector General ("IG") of the LSC on September 5, 1989, pursuant to the Inspector General Act of 1978, codified at 5 U.S.C.App. 3, § 8E. The written employment agreement between Wilkinson and the LSC provides for an initial two-year term of office, which would be automatically extended from year to year unless either party gave notice of an intent not to extend by March 5 of the final year of the contract.

As IG, Wilkinson reported directly to the eleven member Board of Directors ("Board") that governs the LSC. The members of the Board, who are appointed by the President of the United States with the advice and consent of the Senate, serve a specific term of years, but the LSC Act states that each member of the Board shall continue to serve until a successor to that member is appointed and confirmed. *See* 42 U.S.C. § 2996c(b). Further, the by-laws of the LSC require each member of the Board to execute a "willingness to serve statement," which avows that they will discharge the required duties faithfully. One of these required duties is to elect the President of the LSC, who serves as chief executive officer subject to the Board's supervision.

On October 1, 1990, David H. Martin ("Martin") began his term as President of the LSC. Plaintiff alleges that from October 1990 to "at least" January 1991, Martin "assumed and exercised total power and control over management of the [LSC], on the asserted basis that there were no qualified members of the Board of Directors to whom he was required to report during that period." Second Amended Complaint ¶ 4A. Wilkinson further alleges that Martin "conceived and initiated a scheme to get rid of other senior officials and employees of the [LSC], including the Vice President and General Counsel, the Secretary ... and the Inspector General, and to hire personal friends in responsible positions at the [LSC]." *Id.*

On January 2, 1991, the President of the United States announced eleven recess nominations to the Board.[1] The eleven individuals were formally nominated on February 7, 1991, but were never confirmed by the Senate. Further, none of the eleven individuals signed a "willingness to serve" statement before February 22, 1991.

Prior to February 22, 1991, the Board retained outside counsel to advise it of its rights under Wilkinson's employment contract. By letter dated February 25, 1991, the LSC notified Wilkinson that his employment contract would not be extended beyond September 5 of that year. Subsequently, on March 25, the Board convened an executive session to meet with the outside counsel and discuss the matter of plaintiff's employment contract.

The second amended complaint has three counts. Count I alleges that the Board conducted meetings in private in violation of the Sunshine Act and the by-laws of the LSC, both of which require open meetings. Specifically, this count alleges that on January 28, 1991, February 22, 1991 and March 25, 1991, portions of the Board meetings were unlawfully closed to the public. Count II alleges that the members of the Board given recess appointments by the President on January 2, 1991 and formally nominated on February 7, 1991 did not have the power to act as Directors. In this count, plaintiff alleges that the Recess Appointments Clause does not apply to the LSC and that the Directors were never confirmed by the Senate. In Count III, plaintiff claims that the termination of his employment on September 6, 1991 was in violation of the by-laws of the LSC and the LSC Act.

## II. *Discussion*

The parties have each moved for summary judgment on all three counts. In addition, the United States has intervened as a defendant in this action and filed a motion for summary judgment as to Count II. Summary judgment is appropriate when there is "no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c).

---

1. As explained more fully *infra*, the Recess Appointments Clause grants the President the "Power to fill up all vacancies that may happen during the Recess of the Senate, by granting Commissions which shall expire at the End of their next Session." U.S. Const. Art. II, § 2, cl. 3.

"The inquiry performed is the threshold inquiry of determining whether there is a need for trial—whether, in other words, there are any genuine issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). In considering a motion for summary judgment, the "evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255, 106 S.Ct. at 2513. At the same time, however, Rule 56 places a burden on the nonmoving party to "go beyond the pleadings and by [his] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).

### A. *The Sunshine Act*

In Count I, plaintiff raises a number of procedural challenges to the closing of portions of the January 28, 1991, February 22, 1991 and March 25, 1991 meetings of the Board. Specifically, plaintiff alleges that: (1) there was no adequate or meaningful public notice of closure; (2) the votes used to close the meetings were done in violation of the by-laws; (3) the public explanations for the closed meetings were inadequate; (4) the general counsel was not given an opportunity to determine if the meetings were lawfully closed; (5) the transcripts of the meetings were not made open to the public or properly maintained; and (6) the LSC did not keep attendance records of the meetings. Defen-

dant denies each of these alleged procedural irregularities and further claims that the questioned meetings were properly closed pursuant to Exemptions 2, 9(B) and 10 of the Sunshine Act and the attorney-client privilege.[2]

Resolution of this count necessarily proceeds in two phases. First, it must be determined whether the claimed Sunshine Act exemptions or the attorney-client privilege apply to the questioned meetings. If any one of these justifications for public closure apply, then the procedural challenges must be evaluated.

 As stated above, defendant claims that the subject meetings were properly closed to the public pursuant to Exemptions 2, 9(B) and 10 of the Sunshine Act. These claims must be analyzed in light of the policy of the Sunshine Act, which is that "the government should conduct the public's business in public." *Common Cause v. Nuclear Regulatory Comm'n,* 674 F.2d 921, 928 (D.C.Cir. 1982) (citation omitted); *see Clark–Cowlitz Joint Operating Agency v. F.E.R.C.,* 798 F.2d 499, 501 (D.C.Cir.1986) (en banc); Government in the Sunshine Act, ch. 409, 90 Stat. 1241 (1976) (declaring as the policy of the Sunshine Act that "the public is entitled to the fullest practicable information regarding the decisionmaking process of the Federal Government"). Toward this end, the Sunshine Act requires that every meeting of a federal agency be open to the public, although portions of a meeting may be closed if the discussions are "reasonably likely" to fall within one of the ten enumerated exemptions. *Common Cause,* 674 F.2d at 928; *Philadelphia Newspapers, Inc. v. Nuclear*

2. Defendant originally relied on Exemption 6 as well, but has apparently withdrawn that reliance. In any event, Exemption 6, which exempts "information of a personal nature", does not apply when such discussions involve a high level employee such as Mr. Wilkinson. *See Common Cause v. Nuclear Regulatory Comm'n,* 674 F.2d 921, 938 (D.C.Cir.1982).

Defendant also originally argued that plaintiff's claims regarding the January 28, 1991 Board meeting were untimely because the Sunshine Act requires all claims to be brought within 60 days of the alleged violation. 5 U.S.C. § 552b(h)(1); *see* Defendant Legal Services Corporation's Memorandum of Points and Authorities in Sup-

port of its Motion for Summary Judgment [on Count I] at 14. The LSC has apparently withdrawn this argument in light of the tolling provision of § 552b(h)(1), which provides that "if public announcement of such meeting is not initially provided by the agency in accordance with the requirements of this [Act], such action may be instituted … at any time prior to sixty days after public announcement of such meeting." *See* Reply Memorandum of Defendant Legal Services Corporation in Support of its Motion for Summary Judgment on Count I and Opposition Memorandum to Plaintiff's Cross–Motion for Summary Judgment on Count I.

*Regulatory Comm'n,* 727 F.2d 1195 (D.C.Cir. 1984). The exemptions, however, are to be narrowly interpreted and the agency bears the burden of proof on any claimed exemption. *Common Cause,* 674 F.2d at 928.

■ The first Sunshine Act exemption upon which defendant relies is Exemption 2. Exemption 2 permits an agency to close any meeting or any portion thereof at which information that "relate[s] solely to the internal personnel rules and practices of an agency" will be discussed. 5 U.S.C. § 552b(c)(2). Defendant claims that because any discussion regarding Wilkinson's position at the LSC is a "strictly internal matter," it falls within the purview of Exemption 2. Defendant Legal Service Corporation's Memorandum of Points and Authorities in Support of Motion for Summary Judgment ("Defendant's Mem.") at 19–20 (quoting H.R.Rep. No. 94–880 (Part I), 94th Cong., 2nd Sess. 9 (1976)), U.S.Code Cong. & Admin.News, 1976, p. 2183, 2191.

There is a dearth of case law interpreting Exemption 2 of the Sunshine Act. In *Common Cause,* however, our Court of Appeals noted that the language of Exemption 2 to the Sunshine Act "is virtually identical with that in Exemption 2 to the Freedom of Information Act" ("FOIA"). 674 F.2d at 937. That court further recognized that the "conference report on the Sunshine Act expressly adopts the standards of *Dep't of Air Force v. Rose,* ... the leading Supreme Court decision interpreting Exemption 2 of FOIA." *Id.* In *Department of Air Force,* the Supreme Court, relying on the Senate Report to FOIA, interpreted Exemption 2 to include only "minor or trivial matters" and not "those more substantial matters which might be the subject of legitimate public interest." 425 U.S. 352, 365, 96 S.Ct. 1592, 1601, 48 L.Ed.2d 11 (1976). Because any discussion of the employment status of high ranking officials at the LSC is not a "minor or trivial matter," Exemption 2 does not permit closure of any of the LSC meetings at issue.

■ The next exemption upon which the LSC relies is Exemption 9(B), which permits closure if the discussion at the meeting would "disclose information the premature disclosure of which would ... be likely to signifi-cantly frustrate implementation of a proposed agency action." 5 U.S.C. § 552b(c)(9). Defendant asserts that this exemption applies because the Board discussed its assessment of plaintiff's bargaining position at the meetings, and public disclosure of this position would operate to the detriment of the LSC. Defendant's Reply at 7.

Although this exemption is difficult to interpret and, perhaps, more perplexing to apply, the LSC has not met its burden of justifying closure pursuant to Exemption 9(B). An analysis of this exemption must be mindful that the principle of narrow construction applies "with particular force to this exemption." *Common Cause,* 674 F.2d at 932. This is primarily because Congress deliberately excluded an exemption comparable to FOIA Exemption 5 (predecisional deliberations) from the Sunshine Act, and courts must be wary not to permit Exemption 9 to be used as a *de facto* equivalent of FOIA Exemption 5. *Id.* An Exemption 9(B) claim, therefore, is properly analyzed in reference to the four concrete examples of the application of this exemption in the House and Senate Reports. The examples referenced in the House and Senate Reports are (1) an agency considering an embargo on foreign shipments of certain goods; (2) an agency discussing whether to approve a proposed merger; (3) an agency proposing its strategy for an upcoming collective bargaining with its employees; and (4) an agency contemplating a purchase of real property. *See Common Cause,* 674 F.2d at 933. The common thread in these examples is that disclosure of the agency's proposals or bargaining position "could affect private decisions by parties other than those who manage the federal government," and the "private responses of such persons might damage the regulatory or financial interests of the government as a whole." *Id.* Any discussion of Mr. Wilkinson's employment status is much more akin to unprotected "predecisional deliberations" than to the actions protected by Exemption 9(B).

■ The final exemption upon which the LSC relies is Exemption 10. This exemption permits an agency to close a meeting if the

discussion will address, *inter alia,* "the agency's participation in a civil action or proceeding". 5 U.S.C. § 552b(c)(10). There is no requirement that litigation be pending, provided adversarial proceedings are imminent. *See Clark–Cowlitz Joint Operating Agency,* 798 F.2d at 499. Defendant claims that "[l]arge portions of the January 28, 1991, February 22, 1991, and March 25, 1991 executive sessions were devoted to presentations by LSC's chief legal officer concerning LSC's involvement in pending litigation." Defendant's Reply at 8–9. Plaintiff does not dispute this assertion, insofar as LSC's counsel discussed then-pending or imminent litigation matters with the Directors. Plaintiff's Reply at 4. The LSC, however, has given no indication that any discussion regarding Wilkinson's employment status and any potential litigation spawned therefrom occurred at the meetings. Accordingly, Exemption 10 does not apply.[3]

■ Finally, LSC claims that the attorney-client privilege shields disclosure of the meeting transcripts. This claim cannot be sustained. Congress did not include in the Sunshine Act an exemption similar to FOIA's Exemption 5 for predecisional memoranda, which the Supreme Court has held to incorporate the attorney-client privilege. *See NLRB v. Sears, Roebuck & Co.,* 421 U.S. 132, 154, 95 S.Ct. 1504, 1518, 44 L.Ed.2d 29 (1975). To permit the LSC to hide behind the shield of the attorney-client privilege would be an impermissible inclusion of FOIA Exemption 5 into the Sunshine Act or an unjustified extension of Exemption 10. *See Clark–Cowlitz Joint Operating Agency,* 798 F.2d at 505 (Wright and Mikva, JJ., dissenting). Accordingly, because the meetings were improperly closed, summary judgment will be granted for plaintiff on Count I.[4]

## B. *The Recess Appointments Clause*

■ In Count II, plaintiff claims that he was improperly terminated because the Directors who approved his termination were not properly in office. Wilkinson claims that the Recess Appointments Clause, pursuant to which all ten Directors who approved his termination were appointed[5], does not apply to the LSC and that, therefore, those Directors did not have the power to approve his termination.

The Appointments Clause of the United States Constitution provides that the President "shall nominate, and by and with the Advice and Consent of the Senate, shall appoint ... all ... Officers of the United States...." U.S. Const. Art. II, § 2, cl. 2. The drafters recognized that an appointment might be necessary at a time when advice and consent of the Senate would not be possible due to a congressional recess.[6] The succeeding clause provided for this contingency by granting the President the "Power to fill up all vacancies that may happen during the Recess of the Senate, by granting Commissions which shall expire at the End of their next Session." U.S. Const. Art. II, § 2, cl. 3. This latter clause has become known as the Recess Appointments Clause.

These Article II, Section 2 provisions are not easily applied to the LSC Act. The LSC Act provides that the eleven voting members of the LSC Board shall be "appointed by the President, by and with the advice and consent of the Senate." 42 U.S.C. § 2996c(a). This language appears specifically to reference the Appointments Clause, along with

---

3. Nonetheless, plaintiff is not asking for, and is not entitled to, all of the transcripts from the meetings in question. He properly recognizes that Exemption 10 protects those portions of the transcripts in question at which LSC's counsel discussed then-pending or imminent litigation matters with the Directors.

4. This disposition renders moot plaintiff's claim that the LSC did not properly follow Sunshine Act procedures in closing the meetings.

5. One of the directors recused himself from consideration of Wilkinson's employment status.

6. This was more of a concern in the early days of our government when Congress was in session for only several months of the year. In fact, for "the first 49 Congresses, from 1789 to 1887, Congress spent more days in recess than it did in session." Stuart J. Chanen, Comment, *Constitutional Restrictions on the President's Power to Make Recess Appointments,* 79 Nw.U.L.Rev. 191, 196 n. 30 (1984) [hereinafter *Recess Appointments* ] (citing Office of the Secretary of the Senate, Presidential Vetoes, 1789–1976 at x-xx (1978) (dates of sessions of Congress)).

the complementary Recess Appointments Clause. Indeed, were this the sole provision of the LSC Act regarding membership on the Board, resolution of this claim would be relatively ministerial.

Two subsequent provisions of the LSC Act complicate this determination. First, the LSC Act provides that the "members of the Board shall not, by reason of such membership, be deemed officers or employees of the United States." 42 U.S.C. § 2996c(c). Plaintiff argues that this subsection removes the Board from the province of the Appointments Clause, which, by its own terms, applies only to "Officers of the United States." U.S. Const. Art. II, § 2, cl. 2.

This argument, despite its facial appeal, can be easily dismissed. The term "Officers of the United States" has constitutional significance in the Appointments Clause. *Id.* In contrast, there is no corresponding constitutional meaning to the term "employees" of the United States, and it is unlikely that Congress intended the word "officers" to be used in the constitutional sense when the word "employees" in the same phrase has no constitutional meaning. It is much more likely that 42 U.S.C. § 2996c(c) merely uses "officers" in the statutory sense, to limit the statutory benefits—as opposed to the constitutional rights—to which the members of the Board are entitled. *See Dana v. McCalpin,* No. 82–542 (D.D.C. Oct. 5, 1982), *vacated as moot,* 766 F.2d 575 (D.C.Cir.1985); *cf. National Treasury Employees Union v. Reagan,* 663 F.2d 239, 246 (D.C.Cir.1981).

A second provision of the LSC Act presents a problem that cannot be so easily resolved. The LSC Act limits the term of office for the Board members to three years, but then provides that "Each member of the Board shall continue to serve until the successor to such member has been appointed and qualified." 42 U.S.C. § 2996c(b). Plaintiff argues that this "holdover" provision pre-

vents a recess appointment because the Recess Appointments Clause, by its own terms, depends upon the existence of "vacancies" and there are no "vacancies" on the LSC Board because the holdover Director rightfully occupies that position.[7] The Court, therefore, must determine whether the expiration of a statutory term of office for an LSC Director creates a "vacancy" to trigger application of the Recess Appointments Clause.

This determination properly begins with an examination of the constitutional text and history. If it is clear that the Framers intended the Recess Appointments Clause to provide the President sweeping appointment authority, then the LSC Act would be reviewed in this light. On the other hand, if the Framers intended the Recess Appointments Clause to be an emergency provision, the LSC Act would be evaluated accordingly.

It is difficult to ascertain the Framers' true intention in drafting the Recess Appointments Clause. There was little discussion and no debate on this provision at the Constitutional Convention. *See* 2 M. Farrand, *Records of the Federal Convention of 1787* (rev. ed. 1966), at 533, 540, 574, 600 (cited in *Staebler v. Carter,* 464 F.Supp. 585, 596 (D.D.C.1979)). The only references to this Clause are Alexander Hamilton's comments that it should be used for "temporary appointments" when "it might be necessary for the public service to fill [a vacancy] without delay" and that it was intended as a "supplement" to the Appointments Clause. *Staebler,* 464 F.Supp. at 596, 596 n. 26 (quoting *The Federalist No. 67* (Wesleyan ed. 1961) at 455).

The give-and-take between early Presidents and Congresses reveals the historic tension between the legislature and the executive over the power to make recess appointments.[8] To illustrate, it appears that Presi-

---

7. This argument accompanies plaintiff's argument that a recess appointment constitutes a "removal" of a sitting director in violation of 42 U.S.C. § 2996c(e), which provides that "A member of the Board may be removed by a vote of seven members for malfeasance in office or for persistent neglect of or inability to discharge duties, or for offenses involving moral turpitude,

and for no other cause." Memorandum in Support of Plaintiff's Motion for Summary Judgment on Counts Two and Three at 3–5. Although interesting, it is unnecessary to decide whether plaintiff would have standing to challenge the removal of Directors.

8. In fact, the issues of whether the vacancy has to "occur" during a congressional recess or

dent Washington sought and obtained Congress' permission before making recess appointments. *See* J. Harris, *The Advice and Consent of the Senate* 256 (1968) (cited in *Recess Appointments, supra,* at 197). This practice was not followed by subsequent Presidents, such as John Quincy Adams, Andrew Jackson and James Madison, frequently over congressional protestation. *See Recess Appointments, supra,* at 197–200.[9]

The tension ultimately spawned the Army Appropriation Act of 1863 [10], which was reenacted as part of the Tenure of Office Act in 1867.[11] *Id.* at 201–02. The Tenure of Office Act entitled all civil government employees "to hold such office until a successor shall have been in like manner [by and with the advice and consent of the Senate] appointed and qualified." 14 Stat. 430 (1867).

Although the Tenure of Office Act was ultimately repealed, it was the precursor of numerous federal "holdover" provisions. In fact, there may be as many as sixty such provisions in the current United States Code. *See, e.g.,* 5 U.S.C. § 1202(b) (Merit Systems Protection Board member "may continue to serve until a successor has been appointed and has qualified, except that such member may not continue to serve for more than one year after the date on which the term of the member would otherwise expire under this section"); 19 U.S.C. § 1330(b) (member of the International Trade Commission "may continue to serve ... until his successor is appointed and qualified"); 16 U.S.C. § 792 (member of the Federal Power Commission "shall be appointed ... until his successor is appointed and has qualified, except that he shall not so continue to serve beyond the expiration of the next session of Congress"); 49 U.S.C. § 10301 (Interstate Commerce Commission member "may continue to serve

until a successor is appointed and qualified"); 15 U.S.C. § 41 (Federal Trade Commission member "upon the expiration of his term of office ... shall continue to serve until his successor shall have been appointed and shall have qualified"); 15 U.S.C. § 78d(a) (member of the Securities and Exchange Commission "shall hold office ... until his successor is appointed and has qualified, except that he shall not so continue to serve beyond the expiration of the next session of Congress").

Despite these numerous holdover provisions, there have been few judicial challenges in this context. The first challenge in the federal courts occurred in *Staebler v. Carter,* 464 F.Supp. 585 (D.D.C.1979). In *Staebler,* Judge Harold Greene rejected the identical argument made in the instant case in the context of the Federal Election Campaign Act ("FEC Act"). Judge Greene first observed that plaintiff's argument was somewhat "circular" and stated that:

> If that be the correct analysis, the creation of a vacancy and its extinction by the appointment of a successor always and inevitably occur at the same instant and by the same act (i.e., an affirmative vote on a nomination by the Senate). While in theory it is not impossible for the Congress to have devised this kind of a circular scheme, it certainly constitutes a somewhat implausible method for organizing governmental operations and for that reason should not be attributed to Congress in the absence of persuasive evidence that this is what was intended.

464 F.Supp. at 589.

Beginning with this presumption that the recess appointments were valid, the Court

whether it simply has to "exist" during a recess and what constitutes a "recess" for purposes of the Recess Appointments Clause have never been resolved. Neither of these issues is before this Court today.

**9.** Early historical practice can provide evidence of the intent of the Framers, but the evidence here is insufficient to draw any firm conclusions. *See Stuart v. Laird,* 5 U.S. (1 Cranch) 299, 2 L.Ed. 115 (1803) (noting that early historical practice can put a constitutional issue "at rest"); *see also* Thomas A. Curtis, Note, *Recess Appoint-*

*ments to Article III Courts: The Use of Historical Practice in Constitutional Interpretation,* 84 Colum.L.Rev. 1758 (1984).

**10.** 12 Stat. 646 (1863), currently codified at 5 U.S.C. § 5503 (1982). With certain limitations, this Act prohibits payment of money from the Treasury to recess appointees when the vacancy to which they were appointed existed while Congress was in session.

**11.** 14 Stat. 430, *repealed by* 24 Stat. 500 (1887).

then examined the language of the statute[12], its legislative history and several canons of construction. It concluded that a vacancy occurred on the Federal Election Commission upon expiration of a term of office, notwithstanding the holdover provision in the FEC Act.

First, the FEC Act mandates "that a 'vacancy occurring other than by expiration of a term of office' shall be filled only for the remainder of the unexpired term." 464 F.Supp. at 590. By implication, the court ruled, this language proved that a vacancy *must* occur at the expiration of a term of office. *Id.* Second, the court was disturbed by the absence of any discussion on this issue in the legislative history:

> The Court finds it difficult to believe that, had the Congress intended to take the significant step of attempting to curtail the President's constitutional recess appointment power, or even to legislate in the area of that power, it would not have considered the matter with more deliberation or failed to declare its purpose with greater directness and precision. No such deliberation or direction can be found in this legislative history.

464 F.Supp. at 592. Next, Judge Greene noted that holdover provisions had been interpreted by various Presidents since 1915 not to conflict with the Recess Appointments Clause and Congress has never objected to this practice. *Id.* at 594. Finally, the court stated that interpreting the statute to reduce the President's ability to make recess appointments would be of questionable constitutional validity and should be rejected if this can be fairly done. *Id.* at 596.

Although *Staebler* was decided in the context of the FEC Act, its broad wording could apply to recess appointments in general. In fact, Judge Norma Johnson relied exclusively on *Staebler* to conclude summarily that this issue "requires little discussion" in the context of the LSC in *McCalpin v. Dana,* No. 82–542 (D.D.C.1982), Slip Op. at 20, *vacated as moot, McCalpin v. Durant,* 766 F.2d 535 (D.C.Cir.1985).

This issue was revisited by the District Court in *Mackie v. Clinton,* 827 F.Supp. 56 (D.D.C.1993). In *Mackie,* Judge Louis Oberdorfer held that the holdover provision for the Board of Governors of the United States Postal Service[13] prevented the creation of a "vacancy" sufficient to permit an appointment pursuant to the Recess Appointments Clause. Relying primarily on the statutory language, Judge Oberdorfer reasoned that, due to the holdover language, the outgoing Governor held the office "unless he dies, resigns, is lawfully removed or some 'successor has qualified,' i.e., has been nominated by the President and confirmed by the Senate." 827 F.Supp. at 58 (footnotes omitted). The court then considered the purpose of the Recess Appointments Clause, which it determined was "to prevent disruptions in the functioning of the government occasioned by periods in which the Senate is unable to perform its role of advice and consent." *Id.* at 58 (citing 41 Op.Atty.Gen. 463, 467 (1960); 33 Op.Atty.Gen. 20, 21–23 (1921)). Such disruptions do not exist if a holdover is in office.

History and precedent, therefore, do not provide for easy resolution of this case. The Recess Appointments Clause has been viewed by some as an emergency measure and by others as a prerogative of the executive. Moreover, federal cases analyzing the issue have reached irreconcilable conclusions. Faced with this lack of guidance, the Court must resort to the most basic tenet of statutory construction: the language of the statute itself. *See Connecticut Nat'l Bank v. Germain,* 503 U.S. 249, ——, 112 S.Ct. 1146,

---

**12.** The Federal Election Campaign Act provides, in relevant part:

(B) A member of the [Federal Election] Commission may serve on the Commission after the expiration of his term until his successor has taken office as a member of the Commission. (C) An individual appointed to fill a vacancy occurring other than by the expiration of a term of office shall be appointed only for the expired term of the member he succeeds.

2 U.S.C. § 437c(a)(2).

**13.** The relevant statutory provision provides:

The terms of the 9 Governors shall be 9 years.... A Governor may continue to serve after the expiration of his term until his successor has qualified, but not to exceed one year. 39 U.S.C. § 202(b).

1149, 117 L.Ed.2d 391 (1992) ("in interpreting a statute a court should always turn first to one, cardinal canon before others.... [C]ourts must presume that a legislature says in a statute what it means and means in a statute what it says there").

The language of the LSC Act is quite telling. Unlike the holdover provisions in *Staebler* and *Mackie*, which are written in the permissive, the holdover provision in the LSC Act is mandatory: "Each member of the Board *shall* continue to serve until the successor to such member has been appointed and qualified." 42 U.S.C. § 2996c(b) (emphasis added). The plain meaning of this language is that each member of the Board remains as a Director after that person's term has expired until the new Director has been "appointed" by the President and "qualified," i.e., confirmed by the Senate. The expiration of a statutory term of office, therefore, does not create a "vacancy" that requires application of the Recess Appointments Clause.

The plain meaning finds support in the purpose of the LSC Act. One of the congressional findings in the LSC Act is that "to preserve its strength, the legal services program must be kept free from the influence of or use by it of political pressures." 42 U.S.C. § 2996. Consistent use of the recess appointments power thwarts this goal. Handpicked recess appointees are undeniably accountable to the President. These Directors can be replaced at the next congressional recess at the whim of the President and can, therefore, be subject to political pressures and used for political purposes.[14] If recess appointments are not permitted, the President will be forced to nominate Directors who will meet congressional approval. These Directors, in turn, will be able to serve three-year terms relatively free from political influence.

Further, there are several notable omissions from the LSC Act. First, there is no additional language, as in *Staebler*, to assist in defining the term "vacancy." The FEC Act discusses a "vacancy occurring *other than by expiration of a term of office*." 464 F.Supp. at 590 (emphasis added). The comparable language in the LSC Act, in contrast, provides that "Any member appointed to fill a vacancy occurring prior to the expiration of the term for which such member's predecessor was appointed shall be appointed for the remainder of such term." 42 U.S.C. § 2996c(b). The plain implication of the language in the FEC Act is that a vacancy occurs at the expiration of a term of office; the same is not true for the LSC Act provision, which could be read to mean that a vacancy occurs some time after the expiration of a term of office (i.e., by the resignation or removal of a holdover Director) as easily as it could be read to mean that a vacancy occurs at the end of a term of office.

Second, the LSC Act neither limits the length of time a holdover may remain in office nor limits the length of time a position may remain occupied by successive recess appointees. *Compare* 42 U.S.C. § 2996 (no limit to term of holdover) *with* 39 U.S.C. § 202(b) (term of a holdover "not to exceed one year"). Accordingly, if Congress, for whatever reason, never confirms any new Directors, it is possible that the entire Board could be comprised of holdover Directors. In contrast, under the approach advocated by the Government and the LSC, the President could continually appoint recess appointees who are, for whatever reason, never confirmed and the entire Board is ultimately comprised entirely of recess appointees.[15]

14. In fact, plaintiff asserts, and neither the government nor the LSC refute, that seven recess directors served three consecutive recess appointments, the equivalent of a full term as a director, and one recess director served four consecutive recess terms. Reply Memorandum in Support of Plaintiff's Motion for Summary Judgment on Counts II and III at 2. This is precisely the scenario recognized, but not decided, by the Court of Appeals in *McCalpin*. That court left for another day a determination of "the significance for our constitutional order of recess appointments that linger beyond brief terms." 766 F.2d at 538.

15. Even the government concedes that this is more than merely a hypothetical, academic exercise. United States Opp. at 16 n. 9. The LSC has been headed almost exclusively by recess appointees since 1980. Five of the Directors' terms expired on July 13, 1980 and the remaining six expired on July 13, 1981. *McCalpin*, 766 F.2d at 536. New nominees were not confirmed until June 12, 1985. *Id.* at 536–37. Moreover,

Neither of these scenarios is, by any means, desirable. Nonetheless, it is preferable to have a board comprised entirely of holdover directors because a holdover director has, at least at some point in time and albeit possibly by a different President and Senate, received a Presidential appointment and Senate confirmation.

Despite this seemingly clear statutory language, it may be useful to examine the legislative history of the LSC Act for any indication of legislative intent. The legislative history reveals that the selection of Directors was a subject of intense struggle. Legislation introduced initially on behalf of President Nixon, H.R. 8163, proposed an eleven-member Board of Directors, appointed by the President with the advice and consent of the Senate, who were removable only by a vote of the members of the Board for specified causes. Congress resisted, and a compromise bill, H.R. 10351, which contained the provisions ultimately passed by both houses of Congress, was introduced.[16] The compromise bill provided for seventeen Directors, six appointed by the President from the public at-large and the remaining eleven appointed by the President from lists presented by various interested groups.

President Nixon vetoed this bill. His veto message evidences the conflict over the appointment of Directors:

The restrictions which the Congress has imposed upon the President in the selection of directors of the Corporation is [sic] also an affront to the principle of accountability to the American people as a whole. Under congressional revisions, the President has full discretion to appoint only six of the seventeen directors....

The sole constituency [an LSC Board member] must represent is the whole American people. The best way to insure this in this case is the constitutional way— to provide a free hand in the appointive process to the one official accountable to, and answerable to, the whole American people—The President of the United States, and trust to the Senate of the United States to exercise its advice and consent function.

7 Weekly Comp.Pres.Doc. 1634–35 (Dec. 13, 1971).

The President's veto was sustained, and various compromise bills were introduced during the 92d Congress. None of these bills permitted the President full discretion to appoint the members of the Board, and the threat of another veto prompted the 92d Congress to adjourn without passing a legal services corporation bill. See Warren E. George, Development of the Legal Services Corporation, 61 Cornell L.Rev. 681, 693 (1976).

In May 1973, President Nixon submitted a new legal services corporation bill to the 93d Congress. H.R. 7824, 93d Cong., 1st Sess. (1973). The appointment provisions of this bill were virtually identical to the original bill President Nixon sent to Congress nearly two years before, but this Congress, in "a major concession," did not dispute the appointment procedures. 119 Cong.Rec. 40460 (Dec. 10, 1973) (remarks of Senator Mondale). President Nixon signed the bill into law on July 25, 1974. Act of July 25, 1974, Pub.L. No. 93–335, 88 Stat. 378 (codified at 42 U.S.C. §§ 2996–96l (Supp. IV, 1974)).

The government makes much of President Nixon's insistence that appointments to the LSC Board be made "in the constitutional way." Although "the constitutional way" certainly includes the Recess Appointments Clause, there is no indication that President Nixon meant anything other than the traditional Appointments Clause powers. In fact, President Nixon specifically stated that the President should be permitted to make appointments and the American people should "trust to the Senate of the United States to exercise its advice and consent function." 7

no new directors were confirmed until fall 1993. Between 1981 and 1993, therefore, only 11 of the 64 people who served as Directors of the LSC were confirmed by the Senate. See Legal Board, The National Law Journal, Nov. 8, 1993, at 10; see also More Recess Appointments, N.Y. Times, Jan. 7, 1991 at A16.

16. The actual bill to pass the House was S. 2008, amended to contain the provisions of H.R. 10351. 117 Cong.Rec. 34737 (October 1, 1971).

**902**

Weekly Comp.Pres.Doc. 1634–35 (Dec. 13, 1971). He never referred to the Recess Appointments Clause.

Indeed, it is impossible to ascertain whether President Nixon ever considered the Recess Appointments Clause in proposing this legislation. President Nixon left office shortly after the LSC Act went into effect, and he never made any appointments—let alone any recess appointments—to the LSC Board. It would, therefore, be inappropriate to attach any clarifying significance to the quoted words of President Nixon.

■ Thus, based upon the language in the LSC Act and the language omitted from the LSC Act, and in the absence of any persuasive legislative history to the contrary, a vacancy does not occur on the LSC Board upon the expiration of a term of office of one of the Directors. A vacancy is created on the Board upon the resignation, death or removal of one of the sitting Directors. This conclusion does not, as the Government suggests, render the statute unconstitutional. The holdover provision does not infringe upon the President's recess appointment power, it merely defines when "vacancies" exist on the LSC Board sufficient to trigger application of the Recess Appointments Clause. Accordingly, plaintiff's motion for summary judgment on Count II will be granted. This determination renders Count III moot.

### III. *Conclusion*

For the reasons expressed above, it is hereby

ORDERED that plaintiff's motion for summary judgment on Count I is granted; it is

FURTHER ORDERED that defendant's motion for summary judgment on Count I is denied; it is

FURTHER ORDERED that plaintiff's motion for summary judgment on Counts II and III is granted as to Count II and moot as to Count III; it is

FURTHER ORDERED that defendant's motion for summary judgment on Counts II and III is denied as to Count II and moot as to Count III; it is

FURTHER ORDERED that the United States' motion for summary judgment on Count II is denied; and it is

FURTHER ORDERED that, in light of the 1993 confirmations to the LSC Board, the sensitive nature of the prospective relief, and the passage of time since the filing of this complaint, it appears useful for the parties to explore the question of relief among themselves, attempting to reach an agreement consistent with this opinion and the needs of the LSC. The Court will, therefore, defer ruling on relief for the time being. If the parties are unable to resolve the issue of damages, plaintiff shall submit a memorandum detailing his position on damages on or before July 15, 1994; defendant's opposition shall be due on or before July 29, 1994; and plaintiff's reply, if any, shall be filed on or before August 5, 1994. Should the United States choose to state its position, it shall do so in accordance with the deadlines established herein for defendant.

IT IS SO ORDERED.

### *JUDGMENT*

In accordance with the Memorandum Opinion and Order issued this date, judgment is hereby entered in favor of plaintiff, David L. Wilkinson, as to Counts I and II of the Second Amended Complaint, against defendant, Legal Services Corporation as to Counts I and II, and against defendant-intervenor United States of America as to Count II.

IT IS SO ORDERED.