# Removal of Holdover Officials Serving on the Federal Housing Finance Board and the Railroad Retirement Board

The President may remove, without cause, members of the Federal Housing Finance Board and the Railroad Retirement Board who are serving in holdover capacities and do not enjoy express tenure protection by statute.

August 1, 1997

## MEMORANDUM OPINION FOR THE COUNSEL TO THE PRESIDENT

You have asked for our opinion about the President's power to remove, without cause, members of the Federal Housing Finance Board ("FHFB") and Railroad Retirement Board ("RRB") who are serving in holdover capacities. Members of neither board enjoy express tenure protection.[1] Your question therefore requires us to address whether, in the face of congressional silence, a restriction on the President's power to remove the board members should be inferred. *See Wiener v. United States*, 357 U.S. 349 (1958). Without such an implied removal restriction, the President may remove the board members without cause even before their terms have expired. *See Myers v. United States*, 272 U.S. 52 (1926).

We conclude that although there is some small risk that a court would find a tenure protection during the holdover period, the clearly better legal view is that such a protection should not be inferred. The President may therefore remove, without cause, the board members serving in holdover capacities.

### I.

In a thorough review of removal jurisprudence from the early days of the Republic to the present, our Office concluded that tenure protection should no longer be inferred when Congress is silent. *See The Constitutional Separation of Powers Between the President and Congress*, 20 Op. O.L.C. 124 (1996); *see also id.* at 168 n.115 (explaining that rationale of *Wiener*, in which Court inferred a removal restriction for a quasi-adjudicatory officer, is suspect in light of subsequent cases, but continues to be followed by some courts). In accordance with this position, there would be no implied tenure protection during FHFB or RRB directors' regular terms, let alone during their holdover periods.

Nevertheless, some courts have continued to suggest that tenure protection may sometimes be inferred when Congress is silent. *See, e.g., Swan v. Clinton*, 100 F.3d 973, 981–84 (D.C. Cir. 1996); *FEC v. NRA Political Victory Fund*, 6 F.3d 821, 826 (D.C. Cir. 1993), *cert. dismissed*, 513 U.S. 88 (1994). These courts have

---

[1] By "tenure protection," we mean a prohibition against removal without cause *See, e.g.,* 5 U S C § 1211 (1994) ("The Special Counsel may be removed by the President only for inefficiency, neglect of duty, or malfeasance in office ")

135

held that such protection is justified whenever Congress has indicated, through the functions it has vested in an agency or through legislative history or statutory language, that the agency must be insulated from the control of the President in order to perform its functions adequately. This rationale does not necessarily extend to board members serving in holdover capacities, however, as they by definition are subject to the President's ability, with the Senate's advice and consent, to appoint successors to their positions. *See Swan*, 100 F.3d at 984. In holdover situations, therefore, a court may first ask (as did the court in *Swan*, despite the objections of the concurring judge, 100 F.3d at 990 (Silberman, J.)) whether tenure protection should be inferred during board members' terms of office. *See id.* at 981–83. If the court finds that tenure protection should be inferred, it asks whether such protection should also be inferred during holdover periods. *See id.* at 984– 87. In answering this second question, courts are likely to require some rationale other than the one supporting tenure protection during appointed terms. *See id.* at 984. We have examined the question of removal of FHFB and RRB holdovers under this methodology in order to be as thorough as possible, although it is our view that removal is not limited even during the directors' terms, in light of the congressional silence on the question.

II.

The FHFB is an "independent agency in the executive branch." 12 U.S.C. § 1422a(a)(2) (1994). It is composed of the Secretary of Housing and Urban Development and four other directors appointed by the President with the advice and consent of the Senate. *See id.* § 1422a(b)(1). The four appointed directors must have "extensive experience or training in housing finance" or "a commitment to providing specialized housing credit." *Id.* § 1422a(b)(2)(A). At least one of the directors must also be chosen from an "organization with more than a 2-year history of representing consumer or community interests on banking services, credit needs, housing, or financial consumer protections." *Id.* § 1422a(b)(2)(B). No more than three of the directors, including the Secretary, may be of the same political party. *See id.* § 1422a(b)(2)(A). No more than one of the appointed directors may be from any single district of the Federal Home Loan Bank System. *See id.*

The four appointed directors of the FHFB serve seven year terms, *see id.* § 1422a(b)(1)(B), unless appointed to fill a vacancy occurring prior to the expiration of a director's term, in which case they serve for the remainder of the original term, *see id.* § 1422a(d)(1). Vacancies "shall be filled in the manner in which the original appointment was made." *Id.* Upon expiration of a director's term, that director "may continue to serve until a successor has been appointed and qualified." *Id.* Directors enjoy no express tenure protection. *See id.* § 1422a.

The primary duty of the FHFB is to "ensure that the Federal Home Loan Banks operate in a financially safe and sound manner." *Id.* § 1422a(a)(3)(A). Specifically, the FHFB supervises the Federal Home Loan Banks and ensures that they carry out their housing finance mission and stay adequately capitalized in the capital markets. *See id.* § 1422a(a)(3)(B). To carry out these duties, the FHFB may promulgate and enforce regulations and orders, may suspend or remove for cause Federal Home Loan Bank employees, may assess the Banks for the Board's expenditures, and may use the United States mails. *See* 12 U.S.C. § 1422b(a) (1994).

The FHFB is in many ways indistinguishable from the Board of the National Credit Union Administration ("NCUA") at issue in *Swan*, a recent case considering tenure protection during holdover periods. In that case, the D.C. Circuit found that although it might infer tenure protection for NCUA Board members during their fixed terms, it would not infer such protection during holdover periods. *See* 100 F.3d at 988. The D.C. Circuit made these determinations by examining the NCUA Board's structure, function, and legislative history, much of which is similar to that of the FHFB.[2]

Like the NCUA Board, nothing in the statutory language establishing the FHFB or its legislative history explicitly grants any protection from Presidential control. Moreover, the FHFB explicitly resides within the executive branch and is not among the "independent regulatory agenc[ies]" listed in the Paperwork Reduction Act, 44 U.S.C. § 3502(10) (1994), which identifies many of the agencies whose members are thought to have tenure protection.[3] Two aspects of the FHFB, however, suggest that Congress may have wanted the FHFB's directors to be independent from the President. These aspects are shared with the NCUA Board and were cited by the D.C. Circuit as indicators of independence. First, members of both boards serve for fixed terms of office. Although fixed terms alone do not provide removal protection, *Parsons v. United States*, 167 U.S. 324, 338–39 (1897), they may offer evidence of agency independence when combined with other factors. *See Swan*, 100 F.3d at 982. Second, the FHFB and NCUA Board serve similar functions in that both Boards regulate financial institutions. The D.C. Circuit determined that this type of function often is a sign of independence from the President as "people will likely have greater confidence in financial institu-

---

[2] The D C Circuit refrained from making any actual holding about the tenure protection of Board members during their ordinary terms  On the other hand, the district court had "decline[d] to infer a restriction upon the President's power to remove NCUA Board members where none was expressly provided for by Congress." *Swan v. Clinton*, 932 F  Supp  8, 13 (D D C  1996) (footnote omitted)  This holding apparently would have extended to removal during a Board member's regular term, as well as during the holdover period

[3] The FHFB could, however, fall within the "other similar agency" language of the Paperwork Reduction Act. 44 U S C  § 3502(10) (1994)

tions if they believe that the regulation of these institutions is immune from political influence." *Id.* at 983.[4]

In addition to these features, the *Swan* court relied on legislative history to suggest that tenure protection might be inferred for NCUA Board members. *See id.* at 982–83. It is less clear from the legislative history of the FHFB that tenure protection should be inferred. The NCUA Board was created in 1978 to replace the NCUA Administrator who had explicitly served at the pleasure of the President. The amendments creating the NCUA Board deleted all reference to the President's removal power. The D.C. Circuit interpreted this silence after an explicit reference as bolstering the inference of tenure protection during NCUA Board members' terms. In contrast, the directors of the FHFB, or its predecessor body, never explicitly served at the pleasure of the President. Early versions of the bill establishing the FHFB did provide that the President could remove the Board's directors at his discretion. *See* S. 413, 101st Cong. § 702(b) (1989). The proposed removal provision was later dropped without comment and the reports accompanying the enacted bill were silent on removal. *See* H.R. Conf. Rep. No. 101–209, at 427–29 (1989). This change in a draft of a bill is less indicative of congressional intent than an amendment to an already enacted law. The change prior to enactment, however, might lend some support to the argument that at least some members of Congress did not want to give the President express discretion to remove directors at will.[5]

The FHFB therefore shares some, but not all, of the features of the NCUA Board that led the D.C. Circuit to state that it would likely infer tenure protection during NCUA Board members' fixed terms of office. *See Swan,* 100 F.3d at 983–84.[6] Even if a court were to reach a similar conclusion with the FHFB, however, the D.C. Circuit held that such features did not necessitate tenure protection during holdover periods. *See id.* at 988. The reasoning behind this holding applies equally to the FHFB as to the NCUA Board. The D.C. Circuit found that inferring holdover protection was not necessary to ensure the independence of NCUA Board members because holdover members can be replaced by a Senate-confirmed successor at any time, including a time when the President disagrees with the mem-

---

[4] As the district court in *Swan* observed, however, the Comptroller of the Currency and the Office of Thrift Supervision "perform similar functions . . . albeit with respect to other financial institutions," but "Congress has not . . . found it necessary to insulate these entities from executive control." 932 F. Supp at 13 n.8 (citations omitted).

[5] Other aspects of the Act's legislative history, however, indicate that Congress was not primarily concerned with the FHFB's independence from the Executive. Even though Congress explicitly describes the Board as an "independent agency," 12 U.S.C. § 1422a(a)(2), Congress was more concerned about the Board's independence from the banking industry and the Department of the Treasury than from the President, *see* S Rep. No. 101–19, at 5–6 (1989), H.R. Conf. Rep. No. 101–209, at 428. Indeed, the President's involvement with the Board was designed to help ensure independence from the banking industry and Treasury Department. *See* S Rep. No 101–19, at 5. All that should be inferred from the status of an "independent agency" is that the entity is not located within another department or agency

[6] A major difference between the two boards is that the Secretary of Housing and Urban Development serves on the FHFB, and one of the directors of the FHFB is, therefore, necessarily subject to the plenary supervision of the President. This structural feature may indicate that independence from the Executive is not necessary for the FHFB to carry out its functions However, it may also indicate an increased need to insulate the FHFB's other directors from the power of the President

ber's decisions. *See id.* at 984. "[H]oldover members know that even if they cannot be removed directly, an unpopular decision may lead the President to nominate a successor immediately or encourage the Senate to speed up confirmation hearings." *Id.* Similarly, FHFB directors serving in holdover capacities can be replaced at any time. *See* 12 U.S.C. § 1422a(d)(1). Therefore, during the holdover period there is no independence to be protected by restricting removal by the President.

The FHFB holdover clause is somewhat different from the NCUA Board holdover clause, however. The FHFB clause permits a director to serve until a successor has been "appointed and qualified," *id.*, whereas the NCUA Board holdover clause permits a member to serve until a successor has "qualified," *see* 12 U.S.C. § 1752a(c) (1994). The D.C. Circuit suggested in *Swan* that the use of "appointed and qualified," as opposed to just "qualified," may indicate Congress's intent to keep holdovers in office until the Senate has confirmed the President's appointees. *See Swan*, 100 F.3d at 986. Congress's intent presumably would be both to provide that the office would not be "vacan[t]" for purposes of the Recess Appointment Clause, so that there would be no ground for a recess appointment by the President, *see Wilkinson v. Legal Services Corp.*, 865 F. Supp. 891, 900 (D.D.C. 1994), *rev'd on other grounds*, 80 F.3d 535 (D.C. Cir.), *cert. denied*, 519 U.S. 927 (1996); *Mackie v. Clinton*, 827 F. Supp. 56, 57–58 (D.D.C. 1993), *vacated as moot*, 1994 WL 163761 (D.C. Cir. 1994), and to grant tenure protection against removal during holdover periods. It seems unlikely, however, that Congress had this intent with the FHFB. First, in suggesting such an intent, the D.C. Circuit relied on the fact that Congress explicitly changed the NCUA Board holdover clause from "appointed and qualified" to "qualified." In contrast, Congress never made any changes to the FHFB holdover clause. Indeed, Congress was completely silent on the issue and in the absence of clear and express legislative intent, a court should not assume that Congress intended to restrict the President's recess appointment powers. *Cf. Franklin v. Massachusetts*, 505 U.S. 788, 800–01 (1992) (textual silence insufficient to subject President to Administrative Procedure Act); *see also Application of 28 U.S.C. § 458 to Presidential Appointments of Federal Judges*, 19 Op. O.L.C. 350 (1995). Second, contrary to the D.C. Circuit's suggestion, the "qualified" in "appointed and qualified" does not have to mean confirmed in order to avoid being surplusage. Rather, nominees qualify when they take their oaths and are sworn in to office, regardless if they have been confirmed by the Senate or have taken office through a recess appointment.[7] *See* Brief for Appellees at 39 n.7, *Swan v. Clinton*, 100 F.3d 973 (D.C. Cir. 1996) (No. 96–5193). We therefore conclude that tenure protection should not be inferred for FHFB directors serving in holdover capacities.

---

[7] It would not be possible to argue that the requirement that FHFB vacancies "shall be filled in the manner in which the original appointment was made," 12 U.S.C. § 1422a(d)(1), indicates Congress's intent to bar recess appointments and keep holdovers in office. *See, e.g., Staebler v. Carter*, 464 F. Supp. 585, 590–91 (D.D.C. 1979).

### III.

The RRB is an "independent agency in the executive branch." 45 U.S.C. § 231f(a) (1994). It is composed of three members appointed by the President with the advice and consent of the Senate. The President must choose one member from recommendations made by representatives of railroad employees and another member from recommendations made by representatives of railroad employers. The President appoints the final member, the Chairman, without recommendation. All three members serve five year terms, unless appointed to fill a vacancy occurring prior to the expiration of a Board member's term, in which case they serve for the remainder of the original term. Upon expiration of a member's term, that member "shall continue to serve until his successor is appointed and shall have qualified." *Id*. Members of the Board enjoy no express tenure protection. *See id*.

The Board is charged with exercising all duties and powers necessary to administer the Railroad Retirement Act. *See id*. § 231f(b). These duties and powers include determining what portion of the taxes collected under the Railroad Retirement Tax Act should be credited to the various benefit accounts, determining who receives annuities and death benefits, making decisions upon issues of law and fact relating to such benefits, arranging payment, keeping records of eligibility and payments, and developing rules and regulations to oversee the process. *See id*.

Nothing in the statutory language establishing the Board or its legislative history explicitly indicates a determination by Congress that the Board's functions require it to be independent of the President's plenary supervision. Moreover, the Board's structure contains features that militate against such independence. The Board is within the executive branch, *see id*. § 231f(a), and is not listed as an "independent regulatory agency" in the Paperwork Reduction Act, 44 U.S.C. § 3502(10). In addition, the statutory language explicitly provides that "[v]acancies in the Board shall not impair the powers or affect the duties of the Board or of the remaining members of the Board, of whom a majority of those in office shall constitute a quorum for the transaction of business." 45 U.S.C. § 231f(a). This provision could militate against independence because it could eviscerate the employer/employee balancing requirement whenever the employer or employee seat is vacant.

On the other hand, the Board's structure contains features that have been considered indicators of independence. First, the Board members serve for fixed terms. *See Swan*, 100 F.3d at 982; *but see Parsons*, 167 U.S. at 338–39 (fixed terms alone do not provide removal protection). Second, the Board has some quasi-judicial functions, which until *Morrison v. Olson*, 487 U.S. 654 (1988), was a determining factor in declaring an agency independent and therefore protecting its board members from arbitrary removal. *See Wiener*, 357 U.S. at 353–56.

We do not believe these features, without more, are enough to conclude that Congress intended the Board to possess that independence conferred by tenure protection. The Board is far from the War Claims Commission at issue in *Wiener.* For example, unlike the Board, *see* 45 U.S.C. § 231g (1994), that Commission was not subject to judicial review. The Board is more like the Social Security Administration, when it was part of the Department of Health and Human Services, than the War Claims Commission. Even if a court concluded, however, that the Board's functions require independence and Board members therefore need tenure protection to carry out these functions, it would not necessarily follow that the Board members would enjoy tenure protection while serving in holdover capacities. *See Swan,* 100 F.3d at 984. Rather, a court would most likely require that the nature of the holdover capacity or language and history of the holdover clause also provide some evidence of Congress's intent to provide tenure protection. *See id.*

The Board's holdover clause provides little evidence of an intent to grant tenure protection during holdover periods. First, holdover members can be replaced by a successor at any time, including a time when the President and Senate disagree with the member's decisions. *See id.* Second, tenure protection under the holdover clause is not necessary to ensure the Board's continuity, as the Board may continue to function with one or two members. *See* 45 U.S.C. § 231f(a). Third, Congress did not seem to be contemplating tenure protection when it added the holdover clause in 1968. *See* Amendments to the Railroad Retirement Act, Pub. L. No. 90–257, § 106, 82 Stat. 16, 21 (1968). In a report explaining the 1968 amendments, the House's only explanation of the holdover clause was that its "purpose is apparent and is similar to provisions for other agencies." H.R. Rep. No. 90–1054, at 27 (1968), *reprinted in* 1968 U.S.C.C.A.N. 1622, 1649.

The only possible indication of holdover tenure protection is the language of the holdover clause itself. One court has held that the use of "shall," as opposed to "may," in a holdover clause indicates Congress's intent that an office occupied by a holdover official not be considered vacant for purposes of recess appointments until the Senate has confirmed the President's appointees. *See Wilkinson,* 865 F. Supp. at 900. Arguably, an additional consequence of the reading might be to grant tenure protection during holdover periods. However, because the statute here does not limit the holdover period, this reading of the holdover clause would give the Senate the power to keep holdovers in office indefinitely by simply refusing to confirm the President's appointees. *See Swan,* 100 F.3d at 986–87; *Staebler,* 464 F. Supp. at 590–91. While there is at least an argument (although not one we would endorse) that such power may be justified when Congress has explicitly stated the need to keep the agency free of political pressures, *see Wilkinson,* 865 F. Supp. at 900, it is unjustified when Congress has not explicitly stated that need, *see Swan,* 100 F.3d at 986; *Staebler,* 464 F. Supp. at 591. There-

fore, holdover tenure protection should not be inferred from the use of the word "shall" in the holdover clause.

Nor should holdover tenure protection be inferred from the "appointed and qualified" language of the holdover clause. As discussed above, the D.C. Circuit has suggested that the use of these terms, as opposed to just "qualified," may indicate Congress's intent to bar recess appointments and keep holdovers in office until the Senate has confirmed the President's appointees. *See Swan*, 100 F.3d at 986. However, the legislative history of the Board's holdover clause does not support an inference of this intent. The House's description of the clause states that it "provide[s] that a Board member would continue to serve until his successor has qualified." H.R. Rep. No. 90–1054, at 27, *reprinted in* 1968 U.S.C.C.A.N. at 1649. The House thus appears to have made no distinction between "appointed and qualified" and "qualified." The language of the Board's holdover clause therefore provides little evidence of Congress's intent to give Board members tenure protection during their holdover periods. If it did, it would apply to recess appointments too. In the absence of clear and express legislative intent, a court should not assume that Congress intended to restrict the President's recess appointment powers. *See, e.g., Staebler*, 464 F. Supp. at 590–91. We therefore conclude that tenure protections should not be inferred for members of the RRB serving in holdover capacities.

RICHARD L. SHIFFRIN
*Deputy Assistant Attorney General*
*Office of Legal Counsel*
